# United States Court of Appeals for the Federal Circuit

2006-5077

FRANK E. ADAIR, CYNTHIA A. ADAMS, JOSEPH ALDRIDGE, EMORY T. ALLEN, JODEE B. ANDERSON, ALFREDO ARIAS, JOSEPH W. ARNETT, LISA D. AYRES, CLYDE J. BAKER, SR., PAUL E. BARNARD, CHARLES M. BELL, ANTHONY O. BENJAMIN, ROY E.  BEVERLY, ARCHIE S. BOATRIGHT, JR., TERRY JAMES BOULINEAU, JOHN BRADFORD, MARY ANN BRANCH, DANNY L. BRANTLEY, JODI BRITT, YANCIE W. BRITT, MICHAEL E. BROWN, PRENTICE KERRY BROWN, WILLIE M. BROWN, DONRET G. BUCKLEY, GREGORY A. BULLMAN, MICHAEL R. BUNCH, JONATHAN NATHANIEL CANN, THOMAS WAY CARTER, ERIN J. CHALFANT, GEORGIA A. CLARK, TYRONE CLARK, RICHARD L. CLEMONS, THOMAS D. COFFEY, DEBRA R. COLEMAN, CHARLES S. COLLINS, JAY D. COLLINS, RANDY L. COURSON, EARL F. COX, VINCENT L. CRAWFORD, VAN F. CREWS, SR., ANTHONY DANCER, DEBRA DAVIS, ROBIN DAVIS, DARIUS E. DELA CRUZ, WILLIAM LESLIE DELK, RICHARD EUGENE DENSON, RICKY DENT, SANDRA DICKENS, JAMES DILLER, JEFF A. DOLLAR, CHARLES MITCHELL DOWLING, GLENN DUNLAP, SR., KAREN S. DUNN, JAMES O. ECHOLS, JR., ALLEN EDENFIELD, BRIAN KEITH EDMUNDS, KERRY EDWARDS, DONALD J. ENFINGER, TIMOTHY  ESTEP, RETINA D. FELTON, DAN FORCE, JERRY C. FORSYTH, JR., KERRY S. FRASIER, DALE T. FREDERICKS, BILLY R. FULKS, CHARLES FUTCH, EDWARD L. GANNOM, RODOLFO GARCIA, JR., BRIAN D. GARTNER, MARINA GIBSON, AMOS GIBSON, IV, ROBERT GILL, MERLE GOARCKE, DONALD WAYNE GRAHAM, GABRIELSON GREER, BRIAN DONALD HAGAN, GORDAN R. HAGGARD, RANDALL E. HAND, GEORGE A. HARGROVE, BETH HARGROVE, J. BRIAN HARRELL, LAVADA YVONNE HARRELL, LUTHER F. HARTER, BRENDA A. HEARN, JOE HEATHERLY, II, STEPHEN HENRIKSEN, BENJAMIN JAMES HOCKENSMITH, JAMES HODGE, FLOYD HOWARD, SCOTT L. HOYLE, THOMAS W. HUTCHESON, WALDEMAR ROSARIO INIGO, ERVIN A. JACKSON, NATHANIEL V. JACKSON, LANCE E. JAMES, DAVID L. JARNIGAN, TRACEY JERMON, BOBBY LEE JOHNSON, DONALD L. JOHNSON, CHRISTOPHER JONES, MICHAEL J. JONES, EDWARD J. JONES, JR., DAMON KENNEDY, MANUEL KING, MARK B. KING, JAMES W. LANKFORD, CARMON M. LARUE, RENEE C. LEE, JAY JIMMIE LEE LEGGETT, KRISTIE LEGGETT, JEANNE LEROUX, CEDRIC W. LINDSEY, ALVIN LEVON LOVETT, HORACE DAVID LOWMAN, G. ERIC MALLARD, SHAWN R. MANNING, PRIMUS MANSFIELD, JR., JOSEPH TODD MARTEL, ROBERT G. MASSEY, WILLIAM ROBERT MATHIS, JR., ALLEN MATTHEWS, RONNIE D. MAULDIN, EDWARD F. MAURO, REGINALD B. MCEUEN, RONALD H. MCGOWAN, JR., DIANE L. MCGRIFF, NORWOOD B. MCQUAIG, JR., JAMES Q. MCRAE, III, JONATHAN MEAD, JANET MEDDERS, RICKEY MILES, CAMI MILLER, RANDY MILTON, NASH D. MITCHELL, BENJAMIN MOORE, JOHNNY E. MOORE, PATRICK C. MOORE, OSCAR J. MOORE, JUSTIN MORAN, DELMA L. MOSELEY, JOSEPH MOSELEY, WAYNE MOSELEY, JAMES C. MOYE, LAWRENCE R. NANOY,

DWIGHT ARLINGTON NEWBOULD, ELLIS LEE NICHOLS, STEEN W. NILE, MICHAEL W. NOWLING, MARVIN ORANGE, MELISSA ORVIN, IGNACIO J. PALACIO, DAVID M. PARKER, RICKY E. PARKER, R.F. PASLEY, ROBERT T. PITTS, II, WESLEY K. POPWELL, NATASHA D. PORTER, WILLIAM H.S. PRATT, THOMAS EUGENE PRESSON, ANNIE ARBUTHNOT PRICE, THOMAS N. PRICE, EARL QUARTERMAN, ANITA A. RABIDOU, RANDALL A. REID, RONNIE C. REID, JENNIFER RICKS, WILLIE H. ROACH, JR., CHAD E. ROBERSON, FRANK ROBERTSON, MARIO ROBINSON, NEAL A. ROGERS, JASON ROGERS, RECO RONCAGLIONE, WILLIAM D. (Dave) ROWLAND, JEFFEREY L. RUSSELL, JOANNE SANTOYO, JOHN C. SCHELL, MARCUS V. SCOTT, RICKY SHEFFIELD, DONALD (Ray) SHIFLET, BILLY M. SINGLETON, MARVIN SLUSSER, JEFFREY SMITH, FRANCES A. SMITH, BOBBY L. SMITH, JR., ROBERT J. SMITH, JR., SEAN L. SNOOK, DORIS E. SPELL, LARRY D. SPELL, LEONARD F. SPELL, WALTER SPENCE, SCOTT N. STANLEY, RICHARD D. STARNES, BILLY RAY STODDARD, JEFFREY STRICKLAND, ANGELA STRICKLAND, CHRISTOPHER J. STRICKLAND, DANNY SULLIVAN, MARIA L. SUMNER, RANDALL LESLIE SUMNER, FREDERICK C. SWEAT, STACEY R. SWEAT, BILLY R. TALLEY, RICHARD E. TANNER, RONALD E. TAYLOR, MIGUEL A. TERRADAS, III, ROY THOMAS, ALAN THOMASON, BOBBY L. THOMSON, JEREMY J. TODD, PAULINO TORRES, YOLANDA TUBBS, DONALD L. VANHUSS, GARY WAHER, JR., BRADLEY WALKER, GLENN WALKER, PAULETTE WALKER, GERALD W. WALLEY, DEBRACA WALTHOUR, HELEN H. WASHINGTON, GUYLEE D. WASHINGTON, JR., JOHN K. WELLINGTON, CLYDE WESTON, CAMERON P. WHEELER, DANNY WHEELER, ARTHUR L. WILLIAMS, JOSEPH M. WILLIAMS, GARY E. WILLIAMS, SR., CONNIE L. WINDHAM, CALVIN L. WINGATE, MARK WOLFORT, THOMAS WOOD, JACQUELYN N. WRIGHT, JOHN G. YAWN, and ASHLEY A. YOUNG,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Wallace E. Harrell, Gilbert, Harrell, Summerford & Martin, P.C., of Brunswick, Georgia, argued for plaintiffs-appellants. With him on the brief was James L. Roberts, IV.

Douglas K. Mickle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General and Todd M. Hughes, Assistant Director. Of counsel on the brief was Melanie Watson, Office of Personnel Management, Office of General Counsel, of Washington, DC. Of

counsel was <u>Alicia Daniels-Lewis</u>, Labor Law Branch, Federal Bureau of Prisons, of Atlanta, Georgia.

Appealed from: United States Court of Federal Claims

Judge Emily C. Hewitt

# United States Court of Appeals for the Federal Circuit

2006-5077

FRANK E. ADAIR, CYNTHIA A. ADAMS, JOSEPH ALDRIDGE, EMORY T. ALLEN, JODEE B. ANDERSON, ALFREDO ARIAS, JOSEPH W. ARNETT, LISA D. AYRES, CLYDE J. BAKER, SR., PAUL E. BARNARD, CHARLES M. BELL, ANTHONY O. BENJAMIN, ROY E.  BEVERLY, ARCHIE S. BOATRIGHT, JR., TERRY JAMES BOULINEAU, JOHN BRADFORD, MARY ANN BRANCH, DANNY L. BRANTLEY, JODI BRITT, YANCIE W. BRITT, MICHAEL E. BROWN, PRENTICE KERRY BROWN, WILLIE M. BROWN, DONRET G. BUCKLEY, GREGORY A. BULLMAN, MICHAEL R. BUNCH, JONATHAN NATHANIEL CANN, THOMAS WAY CARTER, ERIN J. CHALFANT, GEORGIA A. CLARK, TYRONE CLARK, RICHARD L. CLEMONS, THOMAS D. COFFEY, DEBRA R. COLEMAN, CHARLES S. COLLINS, JAY D. COLLINS, RANDY L. COURSON, EARL F. COX, VINCENT L. CRAWFORD, VAN F. CREWS, SR., ANTHONY DANCER, DEBRA DAVIS, ROBIN DAVIS, DARIUS E. DELA CRUZ, WILLIAM LESLIE DELK, RICHARD EUGENE DENSON, RICKY DENT, SANDRA DICKENS, JAMES DILLER, JEFF A. DOLLAR, CHARLES MITCHELL DOWLING, GLENN DUNLAP, SR., KAREN S. DUNN, JAMES O. ECHOLS, JR., ALLEN EDENFIELD, BRIAN KEITH EDMUNDS, KERRY EDWARDS, DONALD J. ENFINGER, TIMOTHY  ESTEP, RETINA D. FELTON, DAN FORCE, JERRY C. FORSYTH, JR., KERRY S. FRASIER, DALE T. FREDERICKS, BILLY R. FULKS, CHARLES FUTCH, EDWARD L. GANNOM, RODOLFO GARCIA, JR., BRIAN D. GARTNER, MARINA GIBSON, AMOS GIBSON, IV, ROBERT GILL, MERLE GOARCKE, DONALD WAYNE GRAHAM, GABRIELSON GREER, BRIAN DONALD HAGAN, GORDAN R. HAGGARD, RANDALL E. HAND, GEORGE A. HARGROVE, BETH HARGROVE, J. BRIAN HARRELL, LAVADA YVONNE HARRELL, LUTHER F. HARTER, BRENDA A. HEARN, JOE HEATHERLY, II, STEPHEN HENRIKSEN, BENJAMIN JAMES HOCKENSMITH, JAMES HODGE, FLOYD HOWARD, SCOTT L. HOYLE, THOMAS W. HUTCHESON, WALDEMAR ROSARIO INIGO, ERVIN A. JACKSON, NATHANIEL V. JACKSON, LANCE E. JAMES, DAVID L. JARNIGAN, TRACEY JERMON, BOBBY LEE JOHNSON, DONALD L. JOHNSON, CHRISTOPHER JONES, MICHAEL J. JONES, EDWARD J. JONES, JR., DAMON KENNEDY, MANUEL KING, MARK B. KING, JAMES W. LANKFORD, CARMON M. LARUE, RENEE C. LEE, JAY JIMMIE LEE LEGGETT, KRISTIE LEGGETT, JEANNE LEROUX, CEDRIC W. LINDSEY, ALVIN LEVON LOVETT, HORACE DAVID LOWMAN, G. ERIC MALLARD, SHAWN R. MANNING, PRIMUS MANSFIELD, JR., JOSEPH TODD MARTEL, ROBERT G. MASSEY, WILLIAM ROBERT MATHIS, JR., ALLEN MATTHEWS, RONNIE D. MAULDIN, EDWARD F. MAURO, REGINALD B. MCEUEN, RONALD H. MCGOWAN, JR., DIANE L. MCGRIFF, NORWOOD B. MCQUAIG, JR., JAMES Q. MCRAE, III, JONATHAN MEAD, JANET MEDDERS, RICKEY MILES, CAMI MILLER, RANDY MILTON, NASH D. MITCHELL, BENJAMIN MOORE, JOHNNY E. MOORE, PATRICK C. MOORE, OSCAR J. MOORE, JUSTIN MORAN, DELMA L. MOSELEY, JOSEPH MOSELEY, WAYNE MOSELEY, JAMES C. MOYE, LAWRENCE R. NANOY,

DWIGHT ARLINGTON NEWBOULD, ELLIS LEE NICHOLS, STEEN W. NILE, MICHAEL W. NOWLING, MARVIN ORANGE, MELISSA ORVIN, IGNACIO J. PALACIO, DAVID M. PARKER, RICKY E. PARKER, R.F. PASLEY, ROBERT T. PITTS, II, WESLEY K. POPWELL, NATASHA D. PORTER, WILLIAM H.S. PRATT, THOMAS EUGENE PRESSON, ANNIE ARBUTHNOT PRICE, THOMAS N. PRICE, EARL QUARTERMAN, ANITA A. RABIDOU, RANDALL A. REID, RONNIE C. REID, JENNIFER RICKS, WILLIE H. ROACH, JR., CHAD E. ROBERSON, FRANK ROBERTSON, MARIO ROBINSON, NEAL A. ROGERS, JASON ROGERS, RECO RONCAGLIONE, WILLIAM D. (Dave) ROWLAND, JEFFEREY L. RUSSELL, JOANNE SANTOYO, JOHN C. SCHELL, MARCUS V. SCOTT, RICKY SHEFFIELD, DONALD (Ray) SHIFLET, BILLY M. SINGLETON, MARVIN SLUSSER, JEFFREY SMITH, FRANCES A. SMITH, BOBBY L. SMITH, JR., ROBERT J. SMITH, JR., SEAN L. SNOOK, DORIS E. SPELL, LARRY D. SPELL, LEONARD F. SPELL, WALTER SPENCE, SCOTT N. STANLEY, RICHARD D. STARNES, BILLY RAY STODDARD, JEFFREY STRICKLAND, ANGELA STRICKLAND, CHRISTOPHER J. STRICKLAND, DANNY SULLIVAN, MARIA L. SUMNER, RANDALL LESLIE SUMNER, FREDERICK C. SWEAT, STACEY R. SWEAT, BILLY R. TALLEY, RICHARD E. TANNER, RONALD E. TAYLOR, MIGUEL A. TERRADAS, III, ROY THOMAS, ALAN THOMASON, BOBBY L. THOMSON, JEREMY J. TODD, PAULINO TORRES, YOLANDA TUBBS, DONALD L. VANHUSS, GARY WAHER, JR., BRADLEY WALKER, GLENN WALKER, PAULETTE WALKER, GERALD W. WALLEY, DEBRACA WALTHOUR, HELEN H. WASHINGTON, GUYLEE D. WASHINGTON, JR., JOHN K. WELLINGTON, CLYDE WESTON, CAMERON P. WHEELER, DANNY WHEELER, ARTHUR L. WILLIAMS, JOSEPH M. WILLIAMS, GARY E. WILLIAMS, SR., CONNIE L. WINDHAM, CALVIN L. WINGATE, MARK WOLFORT, THOMAS WOOD, JACQUELYN N. WRIGHT, JOHN G. YAWN, and ASHLEY A. YOUNG,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  July 30, 2007
_____

Before MICHEL, <u>Chief Judge</u>, GAJARSA and DYK, <u>Circuit Judges</u>.

MICHEL, <u>Chief Judge</u>.

Adair et al. (hereinafter "Adair"), prison guards at the Federal Correctional Institution ("FCI") in Jesup, Georgia, appeal from the final decision of the United States Court of Federal Claims dismissing their complaint seeking enhanced back pay for their exposure to inmates' smoking for a lack of subject matter jurisdiction under the Tucker Act. Adair v. United States, 70 Fed. Cl. 65 (2006). Discerning no reversible error on the part of the Court of Federal Claims, we affirm the judgment of dismissal on the alternative ground that the appellants failed to state a claim for which relief can be granted. The statutes and implementing regulations the complaint invokes simply do not apply to Adair because they do not cover second-hand smoke.

## I. BACKGROUND

The Adair appellants are former and current (1) General Schedule employees under the Classification Act of 1979 and (2) Wage Supervisor or Wage Grade employees of the Federal Bureau of Prisons at the FCI in Jesup, Georgia. In 2005, the Adair employees sued the United States government in the Court of Federal Claims for back pay, hazard pay, environmental hazard pay, and contributions to thrift savings accounts pursuant to 5 U.S.C. §§ 5545(d) (which mandates additional compensation to General Schedule employees whose duties involve unusual physical hardships or hazards) and 5343(c)(4) (which mandates additional compensation to Wage Supervisor or Wage Grade employees whose duties involve unusually severe working conditions or hazards) based on their exposure to Environmental Tobacco Smoke ("ETS") (i.e., second-hand cigarette smoke) at their workplace. The government filed a motion to dismiss the complaint under Rule 12(b)(1) (lack of subject matter jurisdiction) and Rule 12(b)(6) (failure to state a claim) of the Rules of the United States Court of Federal

Claims ("RCFC").[1]  After the parties briefed the alternative bases for the government's motion for dismissal, the Court of Federal Claims dismissed the complaint for lack of subject matter jurisdiction under RCFC 12(b)(1).  Adair, 70 Fed. Cl. at 80.  This timely appeal followed.  After oral argument, we sought and received from the parties supplemental briefing.  We have jurisdiction under 28 U.S.C. § 1295(a)(3) to review the trial court's decision and hence what we consider to be the crux of this case, namely whether ETS is covered by the statutes at issue as interpreted in the regulations implemented by the Office of Personnel Management ("OPM").

## II.    DISCUSSION

We review de novo the Court of Federal Claims' dismissal of a claim for lack of jurisdiction.  First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1286-87 (Fed. Cir. 1999).  We also review without deference the Court of Federal Claims' interpretation of statutes, W. Co. of N. Am. v. United States, 323 F.3d 1024, 1029 (Fed. Cir. 2003), and its RCFC 12(b)(6) analysis, viewing the facts alleged as true, Samish Indian Nation v. United States, 419 F.3d 1355, 1363-64 (Fed. Cir. 2005).

### A.    Jurisdiction

The Tucker Act confers jurisdiction upon the Court of Federal Claims for claims against the United States for money damages "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort" and waives the government's sovereign immunity for these claims.  28 U.S.C. §1491; United States v. Mitchell, 463 U.S. 206, 212 (1983) (Mitchell

---

[1]    RCFC 12(b)(1) and 12(b)(6) closely parallel Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

II). Thus, the Tucker Act does not create any substantive right enforceable against the United States for money damages, but merely confers jurisdiction when such a right is conferred elsewhere. United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). When the source of such alleged right is a statute, it can only support jurisdiction if it qualifies, as most statutes do not, as money-mandating. White Mountain, 537 U.S. at 473.

In Mitchell II, 463 U.S. at 217 (quoting United States v. Testan, 424 U.S. 392, 400 (1976)), the Supreme Court held that a statute is money-mandating only if it "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" The Mitchell II "fair interpretation" rule is satisfied when the statute is "reasonably amenable to the reading" that it is money-mandating. White Mountain, 537 U.S. at 473. Thus, Tucker Act jurisdiction requires merely that the statute be "fairly interpreted" or "reasonably amendable" to the interpretation that it "mandates a right of recovery in damages," White Mountain, 537 U.S. at 472-73, not that a plaintiff-appellant has stated a "proper claim" based on the statute or pled it properly. White Mountain Apache Tribe v. United States, 249 F.3d 1364, 1383 (Fed. Cir. 2001) (internal citation omitted), aff'd White Mountain, 537 U.S. at 468. Indeed, the two inquiries are separate. See Greenlee County, Arizona v. United States, 487 F.3d 871 (Fed. Cir. 2007) (considering the jurisdictional inquiry to be separate from the failure to state a claim inquiry).

The trial court concluded that it lacked jurisdiction over Adair's complaint because 5 U.S.C. §§ 5545(d) and 5343(c)(4) are not money-mandating as applied to Adair. Adair, 70 Fed. Cl. at 69. It viewed Fisher v. United States, 402 F.3d 1167 (Fed.

Cir. 2005) (en banc in relevant part and interpreting White Mountain) (Fisher II), as holding that the Tucker Act jurisdictional test is a "one-step process in which the source alleged as money-mandating would be evaluated against plaintiffs' claims to determine whether the source was money-mandating as to the facts alleged." Adair, 70 Fed. Cl. at 68 (emphasis added). This is not a correct reading of Fisher II.

Fisher II held that a single determination controls whether the plaintiff has identified a money-mandating source for purposes of Tucker Act jurisdiction and whether the statute on its merits provides a money-mandating remedy on which the plaintiff can base a cause of action but made clear that the question of whether the plaintiff has alleged facts sufficient to make out a cause of action is a separate inquiry. Fisher II, 402 F.3d at 1173 ("The single step would be one in which the trial court determines both the question of whether the statute provides the predicate for its jurisdiction, and lays to rest for purposes of the case before it the question of whether the statute on its merits provides a money-mandating remedy.") (emphasis added). "[T]he determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action." Id. (emphasis added); see also Greenlee, 487 F.3d at 876 (discussing the three different inquiries addressed in Fisher II).

If a trial court concludes that the particular statute simply is not money-mandating, then the court shall dismiss the claim for lack of subject matter jurisdiction under Rule 12(b)(1). Fisher II, 402 F.3d at 1173. If, however, the court concludes that the facts as pled do not fit within the scope of a statute that is money-mandating, the

court shall dismiss the claim on the merits under Rule 12(b)(6) for failing to state a claim upon which relief can be granted. Id. at 1175-76 (non en banc portion).

Here, the Court of Federal Claims dismissed Adair's complaint for lack of subject matter jurisdiction, after holding that ETS did not fall within the scope of 5 U.S.C. §§ 5545(d) and 5343(c)(4) or their corresponding regulations. We disagree. The Court of Federal Claims correctly determined that the statutes in question are money-mandating. Even the government conceded there as here that the statutes are money-mandating, albeit not as applied to Adair so as to create an entitlement to damages. The Court of Federal Claims' determination that the statutes are money-mandating defeats the jurisdictional challenge and compels our conclusion that the trial court does have jurisdiction over the Adair cause of action as pled.

That the Court of Federal Claims based its dismissal on lack of subject matter jurisdiction, however, is not fatal to the judgment of dismissal. See Brodowy v. United States, 482 F.3d 1370, 1376 (Fed. Cir. 2007) (declining to remand case to lower court to alter a judgment despite the fact that the court had dismissed the case for want of Tucker Act jurisdiction instead of for failure to state a claim because there were no practical differences between the two forms of dismissal under the facts of that case); Doe v. United States, 463 F.3d 1314, 1325 (Fed. Cir. 2006) (dismissal of claim for want of jurisdiction instead of on the merits is harmless error); Lewis v. United States, 70 F.3d 597, 604 (Fed. Cir. 1995) (treating a dismissal of a complaint for want of jurisdiction under the Tucker Act as a dismissal on the merits). Preceding its determination that it lacked subject matter jurisdiction, the Court of Federal Claims embarked upon statutory construction and an analysis of the implementing regulations. We address the

correctness of the construction of the statute and regulations to determine whether it supports a dismissal of the Adair complaint under RCFC 12(b)(6).

**B.    Interpretation of the two Statutes and their Implementing Regulations**

When we review a challenge to an agency's interpretation of a statute it has been charged with administering, this court engages in the familiar <u>Chevron</u> two-step analysis. <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council</u>, 467 U.S. 837, 842-43 (1984). Employing traditional tools of statutory construction, which include examining the language of the statute and legislative history, we first determine "whether Congress has directly spoken to the precise question at issue." <u>Id.</u> at 842; <u>see also</u> <u>Delverde, SRL v. United States</u>, 202 F.3d 1360, 1363 (Fed. Cir. 2000). If we conclude that Congress expressed a clear and unambiguous intent on the issue, "that intention is the law and must be given effect," <u>Chevron</u>, 467 U.S. at 843 n.9, and the only issue left for us to address is whether the agency's action or interpretation contravenes that intent, <u>Delverde</u>, 202 F.3d at 1363. If, however, we determine that Congress was silent, ambiguous, or unclear on the precise question at issue, we advance to the second step of <u>Chevron</u> where we determine whether the agency's interpretation is based on a permissible construction of the statute. 467 U.S. at 843. As long as the agency's construction is reasonable, we defer to that construction even if we do not believe it to be the best statutory interpretation. <u>See</u> <u>Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 980 (2005).

Adair alleges that their exposure to ETS falls within the scope of the two statutes and their respective implementing regulations. First Am. Compl. at ¶¶ 34-35. We analyze the language of the statutes and regulations to ascertain whether they have

plain and ordinary meaning with respect to the coverage of ETS as a hardship or hazard. See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002); see also Tesoro Haw. Corp. v. United States, 405 F.3d 1339, 1346 (Fed. Cir. 2005) ("We construe a regulation in the same manner as we construe a statute, by ascertaining its plain meaning.").

The government contends that we should accord Seminole Rock deference to OPM's interpretation of its corresponding regulations, even though the interpretation is advanced for the first time during appeal, found solely in the government's brief (signed only by Justice Department attorneys), and not signed by any OPM official, much less one at the policy level, nor, as far as is revealed, circulated through OPM. See Bowles v. Seminole Rock, 325 U.S. 410, 413-14 (1945); see also Gose v. U.S. Postal Serv., 451 F.3d 831, 836 (Fed. Cir. 2006). In fact, only the listing of an OPM attorney as of counsel on the brief reflects any OPM involvement at all. We decline to do so, for there is "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment" on the issue. Auer v. Robbins, 519 U.S. 452, 462 (1997); see also Long Island Care at Home, Ltd. v. Coke, 127 S. Ct. 2339, 2349 (2007). Instead, we interpret the regulations without according deference to the government's litigating position. With respect to the issue of statutory construction, we apply the familiar Chevron framework to the "precise question at issue," namely whether Adair qualifies for enhanced compensation because of their exposure to ETS.

### 1. 5 U.S.C. § 5545(d)

Section 5545(d) provides in pertinent part:

The Office shall establish a schedule or schedules of pay differentials for <u>duty</u> involving <u>unusual physical hardship or hazard</u>, and for any hardship or hazard related to asbestos, such differentials shall be determined by applying occupational safety and health standards consistent with the permissible exposure limit promulgated by the Secretary of Labor under the Occupational Safety and Health Act of 1970. Under such regulations as the Office may prescribe, and for such minimum periods as it determines appropriate, an employee to whom chapter 51 and subchapter III of chapter 53 of this title applies is entitled to be paid the appropriate differential for any period in which he is subjected to physical hardship or hazard <u>not usually involved in carrying out the duties of his position</u>. However, the pay differential--
(1) does not apply to an employee in a position the classification of which takes into account the degree of physical hardship or hazard involved in the performance of the duties thereof, except in such circumstances as the Office may by regulation prescribe; and
(2) may not exceed an amount equal to 25 percent of the rate of basic pay applicable to the employee.

5 U.S.C. § 5545(d) (emphases added). Clearly, the statute does not cover all physical hardships or hazards, but only those that are "unusual."[2] Adair alleges that the FCI Jesup employees worked in areas (<u>e.g.</u>, enclosed areas) where inmates were permitted to smoke.[3] First Am. Compl. at ¶¶ 12, 15. This suggests that ETS was an expected condition of employment "usually involved in carrying out the duties" of Adair's position, especially when those duties involved the caretaking or monitoring of inmates. Additionally, ETS, as part of the ambient air, was commonly encountered indoors and

---

[2]    As the statute does not define "unusual," we apply its ordinary meaning. It is clear from a plain reading of the statute that "unusual physical hardship or hazard" include those "not usually involved in carrying out the duties" of an employee's position. 5 U.S.C. § 5545(d).

[3]    We observe that the Warden at FCI Jesup later issued a Memorandum to ban the purchase of tobacco products as of December 2005 and smoking by inmates as of April 2006 to effectuate a clean air environment, although our analysis of the statutes and regulations is not affected by these actions.

outdoors where people worked or played in the 1960s when the statute was enacted. Thus, contrary to Adair's assertion, the plain language of § 5545(d) does not compel, or even support, a conclusion that ETS is "unusual" within the meaning of the statute.

Nor does the legislative history support Adair's reading of the statute. The Classification Act of 1949 was amended on July 19, 1966, to add § 5545(d) authorizing hazardous duty payment in certain circumstances. See Pub. L. No. 89-512, 80 Stat. 318 (1966). Prior to enactment, separate hazardous duty pay was available for wage board employees, certain military personnel, and public health service employees but not for Classification Act employees, even those who labored beside these individuals, doing the same work. Therefore, the purpose of the amendment was to remove the inequality of Classification Act employees. See Hearing on H.R. 2079 and H.R. 5444 Before the H. Comm. on Post Office and Civil Service, 87th Cong. 5 (2nd Sess. 1962) (testimony of Rep. George Wallhauser); Hazardous Duty Pay: House Report No. 31, 89th Cong. (1st Sess. 1965). As John W. Macy, Jr., Chairman of the U.S. Civil Service Commission, observed:

> We believe that unusual physical hardships or hazards which are inherent in a position, which regularly recurs, and which is performed for a substantial part of the working time, are best compensated for through the regular position classification process. However, there does not now exist a means for providing such compensation where regularly assigned duties are performed under unusually hazardous conditions at such irregular or intermittent intervals that these conditions cannot be taken into consideration for position classification purposes. Yet it seems logical that the Government offer some additional remuneration to the employee asked to take unusual risks not normally associated with his occupation and for which added compensation is not otherwise provided . . . .
>
> We would visualize assignments such as those requiring irregular or intermittent participation in hurricane weather flights, participation in test flights of aircraft during their developmental period or after modification, participation in trial runs of newly built submarines or in submerged

voyages of an exploratory nature such as those under the Polar ice fields, and performance of work at extreme heights under adverse conditions, as among those meeting the criteria of unusual physical hardships or hazard. We recognize that in most regularly recurring hazardous work situations safety training and precautions have been developed which so greatly reduce the possibility of accident that the degree of hazard becomes negligible. The examples cited above, however, go beyond such conditions. They take into consideration, for example, such matters as the need to deliberately operate equipment such as newly developed or modified aircraft beyond its known design capabilities or safe operating limits, and exposure to elements or conditions over which little or no control can be exercised. Normally, few accidents occur in these hazardous situations; nevertheless, such assignments always are accompanied by the undeniable awareness of the inherent danger of the activity and the knowledge that an accident, should it occur, would almost certainly be fatal.

Hazardous Duty Pay: House Report No. 31, 89th Cong. (1st Sess. 1965). Thus, Congress intended the statute to cover assignments that were inherently dangerous because they posed a risk of accident. An FCI employee's exposure to an inmate's cigarette smoke, unlike assignments at extreme heights, however, does not pose a risk of accident.

Congress, moreover, could not have intended to have included ETS as an unusual risk or hazardous work situation because at the time the statute was enacted, Congress was unaware of the dangers of ETS. Yet Congress left open the possibility that ETS could be covered by the statute by delegating to OPM the authority to establish "pay differentials for duty involving unusual physical hardship or hazard." 5 U.S.C. § 5545(d) (emphases added). Arguably, OPM may have the authority to mandate payment for hazards that were not unusual at the time the statute was enacted. In any event, OPM has not done so, as discussed below. See infra, Pt. II.B.2. Therefore, we do not decide any such issue today.

We note, too, Congress' amendment of the statute in 2003 to cover an employee's exposure to asbestos, which Adair contends is comparable to ETS. See National Defense Authorization Act for Fiscal Year 2004, P.L. 108-136, § 1122 (2003). Even then, Congress did not mandate additional compensation for all levels of exposure to asbestos, only for those levels that were above the threshold set by the Occupational Safety and Health Act ("OSHA").[4] However, in the 2003 Amendment, Congress did not mandate additional compensation for ETS.

Adair contends that exposure to ETS is unusual as a matter of law given society's current attitude towards ETS. Appellant Suppl. Br. at 4. What is relevant, however, is not society's current attitude or even this court's attitude about ETS but Congress' view of ETS and OPM's actions regarding ETS. Although Congress knew about the dangers of ETS in 2003, it failed to add ETS as a separate compensable category under § 5545(d). Under the familiar canon of expressio unius est exclusio alterius, we conclude that Congress did not intend to include coverage of ETS, unless perhaps OPM later established a regulation providing for enhanced compensation. See Cook v. Principi, 318 F.3d 1334, 1339 (Fed. Cir. 2002) (en banc). From reading the statute and legislative history, it is unclear whether Congress intended to cover ETS, especially since ETS was not a known hazard then. Possibly, OPM has the power to provide for enhanced compensation for ETS, but we need not decide this question because OPM never did so. Our analysis therefore progresses to step two of the Chevron framework (i.e., an analysis of OPM's regulations).

---

[4] The current threshold or permissible exposure limit is 0.1 fiber per cubic centimeter of air as an eight (8)-hour time-weighted average. See 29 C.F.R. § 1910.1001(c). We observe that even OSHA does not provide for coverage of ETS.

## 2. The Implementing Regulations for 5 U.S.C. § 5545(d)

Because Congress explicitly authorized OPM to establish regulations for payment of differentials under § 5545(d), OPM might be able to extend payment differentials to physical hardships or hazards that were not "unusual" at the time the statute was enacted but have since become unusual. See Chevron, 467 U.S. at 843-44 (stating that where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."). We conclude, however, that OPM has not done so with respect to ETS.

> Section 550.902 of 5 C.F.R. provides the following pertinent definitions:
>
> Duty involving physical hardship means duty that may not in itself be hazardous, but causes extreme physical discomfort or distress and is not adequately alleviated by protective or mechanical devices, such as duty involving exposure to extreme temperatures for a long period of time, arduous physical exertion, or exposure to fumes, dust, or noise that causes nausea, skin, eye, ear, or nose irritation.
>
> Hazardous duty means duty performed under circumstances in which an accident could result in serious injury or death, such as duty performed on a high structure where protective facilities are not used or on an open structure where adverse conditions such as darkness, lightning, steady rain, or high wind velocity exist.

5 C.F.R. § 550.902 (emphases added). Because these definitions are not inconsistent with the plain meaning of the statute, even viewed in light of its legislative history, we accord them deference. Delverde, 202 F.3d at 1363; see also Chevron, 467 U.S. at 844. Environmental tobacco smoke does not fall within these definitions because it can be adequately alleviated by protective or mechanic devices, such as ventilation systems (under the definition of "duty involving physical hardship") and because it does not constitute an "accident" (under the definition of "hazardous duty").

Section 550.904 of 5 C.F.R, to which we also accord <u>Chevron</u> deference because it is a permissible construction of the statute, authorizes OPM to pay the hazard pay differential for job duties listed in Appendix A.[5]  In Appendix A of 5 C.F.R Pt. 550, Subpt. I, which is not unduly restrictive in view of the statute, there is no separate category for ETS.[6]  Adair, however, argues that ETS is a toxic chemical under Appendix A.  We disagree.  Although the government concedes that ETS contains toxic chemicals, the toxic chemicals contemplated in Appendix A are those that have a "possibility of leakage or spillage" (<u>e.g.</u>, as from a container).  In contrast, ETS is an automatic byproduct of cigarette burning–it does not have a <u>possibility</u> of leaking or spilling from cigarettes.  We conclude that ETS does not fall within the regulatory description of toxic chemicals covered by 5 C.F.R Pt. 550, Subpt. I, App. A.

### 3.    5 U.S.C. § 5343(c)(4)

5 U.S.C. 5343(c)(4) provides in relevant part:

The Office of Personnel Management, by regulation, shall prescribe practices and procedures for conducting wage surveys, analyzing wage survey data, developing and establishing wage schedules and rates, and administering the prevailing rate system. The regulations shall provide . . . (4) for proper differentials, as determined by the Office, for duty involving <u>unusually severe working conditions</u> or <u>unusually severe hazards</u>, and for any hardship or hazard related to asbestos, such differentials shall be determined by applying occupational safety and health standards consistent with the permissible exposure limit promulgated by the Secretary of Labor under the Occupational Safety and Health Act of 1970.

---

[5]    Section 550.904 states in relevant part: "An agency shall pay the hazard pay differential listed in appendix A of this subpart to an employee who is assigned to and performs any duty specified in appendix A of this subpart."  5 C.F.R. § 550.904.

[6]    Appendix A provides pay differentials for duties that involve, <u>inter alia</u>, "Exposure to Hazardous Agents, work with or in close proximity to: . . . Toxic chemical materials.  Toxic chemical materials when there is there is a <u>possibility of leakage or spillage</u>."  5 C.F.R Pt. 550, Subpt. I, App. A (emphasis added).

5 U.S.C. § 5343(c)(4) (emphases added).  For reasons similar to those that support our conclusion that ETS is not "unusual" under § 5545(d), we conclude that Adair's argument that ETS is an unusually severe working condition or an unusually severe hazard under § 5343(c)(4) has no merit.  In fact, at the time § 5343(c)(4) was enacted in 1972, P.L. 92-392, 86 Stat. 564 (1972), ETS was not considered "unusually severe." Our conclusion, however, does not rest solely on the statute.  Because Congress may have left open the door for OPM to establish enhanced compensation for hazards and working conditions that were not "unusually severe" at the time the statute was enacted, the Congressional intent respecting ETS coverage is unclear.  See infra, Pt. II.B.1.

### 4.    The Implementing Regulation for 5 U.S.C. § 5343(c)(4)

In response to § 5343(c)(4), OPM promulgated 5 C.F.R. § 532.511, which authorizes the payment of environmental differentials when an employee is exposed to a working condition or hazard covered by one of the categories approved by OPM. The categories justifying environmental differentials are set forth in Appendix A of 5 C.F.R. Part 532, Subpt. E, which lists the pay differentials authorized for exposure to various degrees of hazards, physical hardships, and working conditions of an unusual nature.  ETS is not listed as a separate compensable category in this appendix.

Two categories, however, are argued in this appeal: 1)    Poisons (toxic chemicals)–high degree hazard (for which a 8% pay differential is available) and 2) Poisons (toxic chemicals)–low egress hazard (for which a 4% pay differential is available), both of which became effective on Nov. 1, 1970.    Exposure to toxic chemicals that represent high degree hazards includes

> [w]orking with or in close proximity to poisons (toxic chemicals), other than
> tear gas or similar irritants, which involves potential serious personal injury

such as permanent or temporary, partial or complete loss of faculties and/or loss of life including exposure of an unusual degree to toxic chemicals, dust, or fumes of equal toxicity <u>generated in work situations by processes required to perform work assignments</u> wherein protective devices and/or safety measures have been developed but have not practically eliminated the potential for such personal injury,

whereas exposure to low degree toxic chemicals includes

[w]orking with or in close proximity to poisons (<u>toxic chemicals other than tear gas or similar irritating substances</u>) in situations for which the nature of the work does not require the individual to be in as direct contact with, or exposure to, the more toxic agents as in the case with the work described under high hazard for this class of hazardous agents and wherein protective devices and/or safety measures have not practically eliminated the potential for personal injury.[7]

5 C.F.R. Pt. 532, Subpt. E, App. A (emphases added). Thus, one key difference between the two hazard categories is that the employee in the low degree category can be many degrees removed from the toxic agent. Because the regulation is a reasonable interpretation of the operative language of the statute and does not run afoul of the legislative history,[8] we accord it <u>Chevron</u> deference.

Contrary to Adair's argument, ETS does not fall under either hazard category. First, ETS is the result of recreational activity, not a substance "generated . . . by processes required to perform work assignments." Nor is it clear that ETS would not be excluded as a mere irritant similar to tear gas. Significantly, ETS does not share any commonality with the examples of either high or low degree hazards provided in the regulations:

---

[7] This category of low degree hazard was implemented in 1977.

[8] We note that the 2003 amendment that similarly added asbestos as a compensable category to § 5343(c)(4), did not include ETS as a separate compensable category.

Examples of high degree hazards
Handling and storing toxic chemical agents including monitoring of areas to detect presence of vapor or liquid chemical agents; examining of material for signs of leakage or deteriorated material; decontaminating equipment and work sites; work relating to disposal of deteriorated material (exposure to conjunctivitis, pulmonary edema, blood infection, impairment of the nervous system, possible death)

Renovation, maintenance, and modification of toxic chemicals, guided missiles, and selected munitions

Operating various types of chemical engineering equipment in a restricted area such as reactors, filters, stripping units, fractioning columns, blenders, mixers, pumps, and the like utilized in the development, manufacturing, and processing of toxic or experimental chemical warfare agents

Demilitarizing and neutralizing toxic chemical munitions and chemical agents

Handling or working with toxic chemicals in restricted areas during production operations

Preparing analytical reagents, carrying out colorimetric and photometric techniques, injecting laboratory animals with compounds having toxic, incapacitating or other effects

Recording analytical and biological tests results where subject to above types of exposure

Visually examining chemical agents to determine conditions or detect leaks in storage containers

Transferring chemical agents between containers

Salvaging and disposing of chemical agents

Example of low degree hazard
Handling for shipping, marking, labeling, hauling and storing loaded containers of toxic chemical agents that have been monitored.

5 C.F.R. Part 532, Subpt. E, App. A. Although the examples are not exhaustive, they all

describe scenarios where the job assignment requires directly or indirectly working with

toxic chemicals or containers that hold toxic chemicals as part of a job assignment via

_e.g.,_ marking, storing, neutralizing, operating, preparing, analyzing, transferring, disposing, or otherwise handling toxic chemicals.  The examples do not cover situations in which the employees work with inmates who incidentally smoke, for there is no work "with" ETS in this context.

The examples also do not illustrate situations in which known hazards, such as ETS, are common or ubiquitous in the ambient work environment.  If OPM had amended its regulation, the FCI Jessup employees' exposure to ETS might have qualified them for enhanced pay.  But that is a question we do not answer today, for OPM did not do so.  We therefore conclude that ETS does not fall within the scope of the implementing regulations for § 5343(c)(4).

Therefore, the Court of Federal Claims' dismissal of Adair's complaint could and should have been based on Adair's failure to state a claim under §§ 5545(d) and 5343(c)(4) and the corresponding regulations.  We have considered Adair's other arguments and conclude that they are either unpersuasive or their review is unnecessary for the disposition of this appeal.

### III.    CONCLUSION

Although the Court of Federal Claims erred in ruling that it lacked subject jurisdiction over Adair's back pay claim for enhanced compensation under §§ 5545(d) and 5343(c)(4) and the implementing regulations, the error was harmless because the complaint could have been dismissed on the merits.  A plain reading of the statutes, in conjunction with the legislative history and particularly the regulations implementing the statutes, compels our conclusion that ETS does not fall within the scope of the implementing regulations for either statute.  Should the issue become material at a

future proceeding, the dismissal by the trial court should be treated as one on the merits, rather than on jurisdictional grounds.

## AFFIRMED

## COSTS

No costs.