Timothy O. HOLMES, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 09–208 C.

United States Court of Federal Claims.

April 15, 2010.

Terry L. Elling, Washington, DC, for plaintiff. James Y. Boland, Washington, DC, of counsel.

Richard P. Schroeder, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

### OPINION AND ORDER

HEWITT, Chief Judge.

This case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief may be granted, pursuant to the Rules of the United States Court of Federal Claims (RCFC) 12(b)(1) and 12(b)(6). The court has before it plaintiff's original Complaint (Original Complaint or Compl.) filed April 9, 2009, Docket Number (Dkt. No.) 1, plaintiff's First Amended Complaint (Amended Complaint or

Am. Compl.) filed August 17, 2009, Dkt. No. 26, defendant's Motion to Dismiss First Amended Complaint (Motion or Def.'s Mot.) filed November 4, 2009, Dkt. No. 33, Plaintiff's Response to Defendant's Motion to Dismiss the First Amended Complaint (Response or Pl.'s Resp.) filed December 2, 2009, Dkt. No. 34, and Defendant's Reply to Plaintiff's Response to Motion to Dismiss First Amended Complaint (Reply or Def.'s Reply) filed January 27, 2010, Dkt. No. 39. For the following reasons the court GRANTS defendant's Motion to Dismiss.

## I. Background [1]

Plaintiff is a disabled Navy veteran honorably discharged in December 1990 following twelve years of military service. Am. Compl. ¶ 13. Plaintiff worked as a civilian mariner on the USNS Mars, a naval supply ship operated by the Military Sealift Command, Pacific Fleet, in the position of yeoman storekeeper. *Id.* ¶ 16. Plaintiff was terminated from his employment aboard the USNS Mars on July 22, 1994 for performance reasons. *Id.* ¶ 20. On October 1, 1994, plaintiff filed a complaint with the United States Equal Employment Opportunity Commission (EEOC) alleging that he was wrongfully terminated and that he had been subject to "false, malicious, and discriminatory accusations about his character and conduct aboard [the] USNS Mars." *Id.* ¶ 21. The EEOC investigated charges of racially motivated physical and verbal harassment. *See id.* ¶¶ 18, 22. Pursuant to a March 2008 Freedom of Information Act (FOIA), 5 U.S.C. § 552a, request, plaintiff obtained information originally uncovered during the EEOC's investigation of the 1994 complaint, substantiating the "unlawful discriminatory conduct by certain Navy employees aboard [the] USNS Mars." *Id.* ¶ 22. In August 1995, plaintiff and the Navy executed an agreement (1995 Agreement) to settle the EEOC complaint. *Id.* ¶ 23. The 1995 Agreement required that the Navy remove from plaintiff's Official Personnel Folder (OPF) all adverse performance evaluations and references to disciplinary action taken between September 7, 1993 and July 22, 1994. *Id.*

The 1995 Agreement also required the Navy to document plaintiff's OPF to show that he resigned on July 22, 1994 for personal reasons. *Id.*

In 1996, plaintiff requested and received a copy of his OPF and discovered that the Navy had failed to expunge his record as required under the 1995 Agreement. *Id.* ¶ 24. Following this discovery, plaintiff filed a second complaint at the EEOC on May 1, 1996. *Id.* ¶ 25. The second EEOC complaint was resolved by a settlement agreement reached on November 18, 1996 (1996 Agreement). *Id.* ¶ 26. In the 1996 Agreement, the Navy promised to re-employ plaintiff as a yeoman storekeeper, to provide transportation to his work site, and to document plaintiff's OPF to show that he had resigned on July 22, 1994 for personal reasons. *Id.* ¶ 27, Exhibit (Ex.) A (1996 Agreement).

After the execution of the 1996 Agreement, plaintiff was appointed as a yeoman storekeeper aboard the USNS Guadalupe where he worked between January 1997 and July 1997. *Id.* ¶ 28. After plaintiff left the USNS Guadalupe in July 1997, he was accused of stealing a government-owned refrigerator from his former stateroom and selling the stolen refrigerator to another crew member. *Id.* ¶ 29. Plaintiff maintains that he was falsely accused. *Id.* Between September 1997 and August 1998, plaintiff worked aboard the USNS Kilauea as a civilian storekeeper. *Id.* ¶ 30. Based on the refrigerator theft allegation, the Navy issued a decision on March 20, 1998 suspending plaintiff from his position on the USNS Kilauea for fourteen days. *Id.* ¶ 31. On July 17, 1998, plaintiff filed a third EEOC complaint on the grounds that the suspension was the result of "discriminatory and retaliatory conduct against him." *Id.* ¶ 32.

After his suspension, plaintiff found another civilian storekeeper position with the Navy, this time aboard the USNS Niagara Falls. *Id.* ¶¶ 33–34. While aboard the USNS Niagara Falls, plaintiff was accused of threatening another crew member and the

---

1. The following background information and sequence of events are derived from plaintiff's First Amended Complaint (Amended Complaint or Am. Compl.). Am. Compl. ¶¶ 13–56.

captain proposed to remove him from his position. *Id.* ¶ 35. Plaintiff maintains that the decision to terminate him was made after the captain's review and consideration of plaintiff's personnel record "pertaining to the theft of government property and [the] 14–day suspension." *Id.* ¶ 35. Upon receiving notice of his proposed removal, plaintiff resigned effective July 16, 1999, and, on December 16, 1999, withdrew his third EEOC complaint (filed on July 17, 1998). *Id.* ¶¶ 32, 36–37. Plaintiff filed a civil action against the Navy in the United States District Court for the Central District of California on February 22, 2000.[2] *Id.* ¶ 37. Plaintiff and the Navy settled the district court action on April 26, 2001 on terms contained in another settlement agreement (2001 Agreement). *Id.* ¶ 38. Under the terms of the 2001 Agreement the Navy agreed to "take the necessary steps, within a reasonable time, to expunge from plaintiff's Official Personnel File [ (OPF) ],[3] the fourteen-day suspension for allegedly selling a government refrigerator" and "to provide the Marine Index Bureau (MIB) with a neutral reference for plaintiff." *Id.* Ex. B (2001 Agreement),[4] ¶¶ 3–4; see Am. Compl. ¶ 38. The district court retained jurisdiction "for the purposes of resolving any dispute alleging a breach of [the 2001] [A]greement" for one year. Am. Compl. Ex. B, ¶ 17. Neither the 1996 Agreement nor the 2001 Agreement specifies a compliance date on or before which the Navy must take the various actions agreed to. *See* Am. Compl. Exs. A, B. Only the 2001 Agreement provides a mechanism for the adjudication of disputes-the retention by the district court of jurisdiction for one year. Am. Compl. Ex. B. 5–6.

In 2008, plaintiff filed suit in the United States District Court for the Western District of New York seeking compensatory damages for the Navy's breach of the 1996 Agreement. Am. Compl. ¶ 53. The 1996 Agreement settled an alleged breach by the Navy of the 1995 Agreement between the parties which arose from an alleged violation by the Navy of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e (2006). Am. Compl. ¶ 4. On October 31, 2008, the district court dismissed plaintiff's complaint for lack of jurisdiction and stated that "if plaintiff has any viable action, it lies with the United States Court of Federal Claims." *Holmes v. Dep't of Navy,* 583 F.Supp.2d 431, 433–34 (W.D.N.Y.2008). The district court did not issue a transfer order in the case. *See id.* at 434; 28 U.S.C. § 1631 (2006) (providing a court with the option to "transfer to cure want of jurisdiction"). After the district court issued its dismissal, plaintiff instituted this action by filing his Original Complaint on April 9, 2009 against the United States acting through the United States Navy (defendant, the government or the Navy). Compl. 1. After retaining counsel, plaintiff filed his First Amended Complaint on August 17, 2009. Am. Compl. 1.

Plaintiff seeks money damages based on the Navy's alleged failure to expunge his record and alleged failure of the Military Sealift Command[5] to provide neutral references to prospective employers. *Id.* ¶¶ 70, 75.

---

**2.** The case was originally filed in the United States District Court for the Central District of California and was subsequently transferred to the United States District Court for the Northern District of California, San Francisco Division (*Holmes v. Danzig,* Case No. C00–1839BZ). Am. Compl. ¶ 37.

**3.** Plaintiff's personnel records are referred to as his "Official Personnel Folder" in the parties' briefing and the 1996 Agreement, *see* Am. Compl. ¶ 22, Exhibit (Ex.) A (1996 Agreement), ¶ 2(c) and Defendant's Motion to Dismiss (Def.'s Mot.) 2, and as his "Official Personnel File" in the text of the 2001 Agreement, *see* Am. Compl. Ex. B (2001 Agreement), ¶ 3. The court uses the term "Official Personnel Folder" (OPF) to identify plaintiff's personnel records.

**4.** The copy of the 2001 Agreement provided as Exhibit B to Plaintiff's Amended Complaint was signed in counterparts. The first copy of page five of the 2001 Agreement is signed by Scott T. Nonka, defendant's attorney, and United States Magistrate Judge Bernard Zimmerman. *See* Am. Compl. Ex. B (2001 Agreement) 5–6. The second copy of page five is signed by plaintiff and his attorney, Steven E. Brown. *Id.* 6–6. The authenticity of the 2001 Agreement is not contested.

**5.** According to plaintiff, the National Personnel Records Center (NPRC) in St. Louis, Missouri, has not been in possession of his Official Personnel Folder (OPF) since 2006. Am. Compl. ¶ 67. Plaintiff states that the Military Sealift Command has retained "in its exclusive possession," plaintiff's OPF and "other records pertaining to him in Virginia Beach, VA." *Id.* ¶ 67.

These failures resulted, plaintiff claims, in his inability to obtain permanent employment between 1999 and the present.[6]  *Id.* ¶¶ 40, 70.  Plaintiff maintains that his attempts to obtain employment have been "largely . . . unsuccessful because his personnel record retained by the Navy contained unfavorable employment information" in violation of the 1996 Agreement and 2001 Agreement "that discouraged potential employers from hiring him."  *Id.* ¶¶ 69–70.  Plaintiff contends that the Navy's failure to expunge his record combined with the increased use of background checks by the Seafarers International Union and civilian supply vessels starting in 2005 further restricted his chances of finding even temporary work aboard a supply vessel.  *Id.* ¶ 72.

Plaintiff contends that the Navy "admitted" that it was in breach of the 1996 Agreement and the 2001 Agreement by including records on Standard Form (SF) 50–B in plaintiff's file in violation of both of the agreements.[7]  *Id.* ¶¶ 55 (citing Ex. G), 59, 62–64.  Those records state that plaintiff was discharged during his one-year probationary period (a violation of the Navy's undertaking in the 1996 Agreement) and that he was suspended for fourteen days for the "sale of government property for personal gain" (a violation of the 2001 Agreement).  *Id.* ¶¶ 42 (citing Ex. C), 55 (citing Ex. G), 58–59, 61–64.

## II.  Discussion

### A.  Jurisdiction

#### 1.  Standard of Review

■  Subject matter jurisdiction is a threshold matter to be determined by the court at the onset of a case.  *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("[W]ithout jurisdiction the court cannot proceed at all in any cause.") (internal quotation marks omitted).  If a court determines that it does not have jurisdiction, it must dismiss the claim.  RCFC 12(h)(3).

#### 2.  Tucker Act

The Tucker Act, 28 U.S.C. ¶ 1491(a)(1), provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2006) (Tucker Act).  However, the Tucker Act does not create a substantive right enforceable against the sovereign.  *Arakaki v. United States,* 62 Fed.Cl. 244, 247 (2004) (citing *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000)).

■  In order for the United States Court of Federal Claims (Court of Federal Claims) to exercise jurisdiction over a claim under the Tucker Act, 28 U.S.C. § 1491(a)(1),

---

**6.**  Plaintiff's Amended Complaint indicates both 1999 and 2001 as the beginning of the period in which plaintiff found difficulty obtaining employment.  *See* Am. Compl. ¶ 40 ("Between 2001 and the present, [plaintiff] . . . was denied or not considered for . . . positions because of the Navy's breaches of the 1996 and 2001 Agreements."); *id.* ¶ 70 ("[Plaintiff] has attempted to obtain employment multiple times since 1999, but has largely been unsuccessful because [of] his personnel record.").

**7.**  Plaintiff attaches four Standard Form (SF) 50–B documents to his Amended Complaint.  Am. Compl.  Exhibits (Exs.) C, D, F, G.  Plaintiff states that these documents were included in his OPF as late as August 2006 in violation of the 1996 Agreement or the 2001 Agreement.  *See id.*

8–12, ¶¶ 42 (citing Ex. C), 50 (citing Ex. D), 52 (citing Ex. F), 59, 62 (citing Ex. G), 63–64.  However, the dates typed on the SF 50–B documents do not identify the documents as having been included in plaintiff's OPF at any particular date, nor do they provide any notation, save the plaintiff's own handwritten notation at the top of Exhibit C, that they were included in the plaintiff's OPF after the execution of the 1996 Agreement or the 2001 Agreement.  *See id.,* Exs. C, D, F, G.  Nevertheless, the court takes factual allegations in the complaint as true unless contradicted.  *See Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995) (stating that, when ruling on a motion to dismiss the court is "obligated to assume all factual allegations to be true and draw all reasonable inferences in plaintiff's favor").

a plaintiff must identify "a separate source of substantive law" that "can fairly be interpreted as mandating compensation" by the United States. *Fisher v. United States*, 402 F.3d 1167, 1172–73 (Fed.Cir.2005). The Court in *United States v. White Mountain Apache Tribe (White Mountain Apache)*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), held that the fair interpretation rule demanded "a showing demonstrably lower than the standard for the initial waiver of sovereign immunity." Further, the *White Mountain Apache* Court held, "It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." *Id.* at 473, 123 S.Ct. 1126 (citation omitted); *see United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 ("Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages ... and the claimant must demonstrate that the source of substantive law he relies upon ... mandat[es] compensation ...." (citation and footnote omitted)). The Tucker Act alone "does not create any substantive right enforceable against the United States for money damages." *Mitchell*, 463 U.S. at 216, 103 S.Ct. 2961 (internal quotation marks omitted).

### 3. RCFC 12(b)(1) and RCFC 12(b)(6)

Defendant brings its Motion to Dismiss pursuant to RCFC 12(b)(1) or, in the alternative, RCFC 12(b)(6). Def.'s Mot. 1. RCFC 12 governs dismissal of a claim for lack of subject matter jurisdiction. RCFC 12(b)(1) (motion to dismiss for lack of subject-matter jurisdiction); RCFC 12(h)(3) (requiring dismissal for lack of subject-matter jurisdiction). In *Greenlee County v. United States*, the United States Court of Appeals for the Federal Circuit (Federal Circuit) discussed three grounds upon which the government might file a motion to dismiss in a Tucker Act case: "(1) lack of subject matter jurisdiction due to the lack of a money-mandating source; (2) failure to state a claim upon which relief can be granted due to lack of a money-mandating

source; and (3) failure to state a claim upon which relief can be granted because the plaintiff is ultimately not entitled to recover money damages under the statute." 487 F.3d 871, 876 (Fed.Cir.2007) (citing *Fisher*, 402 F.3d at 1172–73).

■ In *Adair v. United States*, the Federal Circuit clarified when the court should apply RCFC 12(b)(1) or RCFC 12(b)(6) in the context of the court's Tucker Act jurisdiction:

> If a trial court concludes that the particular statute simply is not money-mandating, then the court shall dismiss the claim for lack of subject matter jurisdiction under Rule 12(b)(1). If, however, the court concludes that the facts as pled do not fit within the scope of a statute that is money-mandating, the court shall dismiss the claim on the merits under Rule 12(b)(6) for failing to state a claim upon which relief can be granted.

*Adair v. United States*, 497 F.3d 1244, 1251 (Fed.Cir.2007) (citation omitted). In *Adair*, the Federal Circuit agreed with the Court of Federal Claims that the "statutes in question are money-mandating" but determined that dismissal under RCFC 12(b)(1) was incorrect. *Id. Adair* differs from this case in that the Federal Circuit was deciding the money-mandating status of a statute rather than, as in this case, a contract. However, the Federal Circuit's *Adair* analysis of a source to determine whether or not it is money-mandating appears to the court to be applicable as well to the analysis of whether either the 1996 Agreement or the 2001 Agreement is money-mandating under the Tucker Act.

■ Plaintiff has failed to identify any terms of either the 1996 Agreement or the 2001 Agreement which are reasonably amenable to a reading that supports plaintiff's claim that he is entitled to money damages for defendant's breach. *See White Mountain Apache*, 537 U.S. at 473, 123 S.Ct. 1126 ("[A] statute creating a Tucker Act right [must] be reasonably amenable to the reading that it mandates a right of recovery in damages."). Defendant contends that neither the 1996 Agreement nor the 2001 Agreement can be fairly interpreted as man-

dating compensation by the federal government for damages sustained. Def.'s Mot. 6–9. Defendant also contends that the claim must be for "actual, presently-due money damages from the United States." Def.'s Mot. 7 (citing *United States v. King*, 395 U.S. 1, 3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)).

Plaintiff's argument that the 1996 Agreement and the 2001 Agreement are money mandating in fact tacitly acknowledges the absence of any provision mandating the payment of money for a breach by the government. *See* Pl.'s Resp. 16–18. Plaintiff maintains despite the lack of any term specifying a monetary remedy for breach in either the 1996 Agreement or the 2001 Agreement, that he is entitled to money damages because money damages are "the default remedy for breach of contract." *Id.* Rather than explaining which portions of the 1996 Agreement and the 2001 Agreement support a "fair inference" of a substantive right to money damages, plaintiff merely states the conclusion that money is the default remedy for breach of contract and that the default remedy of money damages extends to contracts settling Title VII employment discrimination suits. Pl.'s Resp. 16–17 (citing *Greenhill v. United States*, 81 Fed.Cl. 786, 790 (2008) ("[M]oney damages are the default remedy for breach of contract.")); *United States v. Winstar Corp.*, 518 U.S. 839, 885, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("[D]amages are always the default remedy for breach of contract."). Plaintiff also makes a conclusory statement that defendant's citations to cases in which the court concluded that settlement agreements did not mandate the payment of money are "distinguishable" from the agreements at issue in this case, but does not further describe how these cases are distinguishable or how any such distinction supports his claim to money damages. Pl.'s Resp. 16 (citing *Griswold v. United States*, 61 Fed.Cl. 458 (2004), *Schnelle v. United States*, 69 Fed.Cl. 463 (2006), and *Phillips v. United States*, 77 Fed.Cl. 513 (2007)). *Phillips* appears particularly unhelpful to plaintiff because the *Phillips* court found that it lacked jurisdiction based in part on the plaintiff's failure to demonstrate how the breached provision of a settlement agreement with the government could fairly be interpreted as creating a right to money damages. *Phillips*, 77 Fed.Cl. at 518–520.

██ Many cases classify money damages as the default remedy for breach of contract. *See, e.g., Cook v. United States*, 85 Fed.Cl. 820, 823 (2009) (citing *San Juan City College v. United States*, 391 F.3d 1357, 1361 (Fed.Cir.2004)). However, breach does not give rise to money damages for default in every contract with the government. As the court stated in *Phillips*, "Breach of [a contractual] duty … cannot be construed to create a substantive right to money damages from the defendant." *Phillips*, 77 Fed.Cl. at 519. Plaintiff must shoulder the burden of "establish[ing] a substantive right of recovery to money damages from the United States." *Id.*

The court does not consider persuasive plaintiff's invocation of *Winstar*, Pl.'s Resp. 17 (citing *Winstar*, 518 U.S. at 885, 116 S.Ct. 2432), as support for his argument that the government is required to pay money damages in the event of any contractual breach for which another remedy is unavailable. *Id.* In *Winstar*, the court addressed money damages arising from contracts between banks and the government. *Winstar*, 518 U.S. at 843–44, 116 S.Ct. 2432. The *Winstar* court, in split opinions, analyzed a specific area of government contracting. *See id.*, 518 U.S. at 843, 910, 919, 924, 116 S.Ct. 2432. In *Winstar*, the government had promised to allow goodwill and capital credits to be counted toward regulatory reserve requirements. *Id.* at 847–51, 853–54, 116 S.Ct. 2432 (explaining the financial structure of the contracts at issue in *Winstar* including the inclusion of capital credits). The government then breached its promise. *Id.* at 870, 116 S.Ct. 2432. The agreement between the government and the plaintiff was not, as here, about personnel records, but about financial assets and insuring against potential losses. *See id.* at 848–49, 881, 116 S.Ct. 2432 (discussing as integral to *Winstar* the allocation by the purchase method accounting of excess of purchase price over fair value to intangible assets and characterizing *Winstar* plaintiffs as filing their lawsuit in an attempt to collect "the [monetary] benefit of promises by the Government to insure them against any loss-

es arising from future regulatory change"). The government's agreement regarding the regulatory accounting treatment of goodwill, for example, permitted the *Winstar* plaintiffs the use of a type of intangible asset as it if it were cash. *Id.* at 848–50, 116 S.Ct. 2432 (discussing the designation of a portion of the bank purchase price to the intangible asset of goodwill). When the government failed to keep its promise, the *Winstar* plaintiffs suffered financial losses. *See id.* at 858, 116 S.Ct. 2432.

■ Plaintiff argues that "there is no generic requirement under the Tucker Act that contracts must include specific language indicating that damages will be paid upon a breach." Pl.'s Resp. 17 (quoting *Stovall v. United States*, 71 Fed.Cl. 696, 700 (2006)). However, even if "no specific language" is mandated by the Tucker Act, the language of a contract, as with the language of a statute or regulation, must support a "fair inference" that money damages are payable for breach. *See White Mountain Apache*, 537 U.S. at 472–73, 123 S.Ct. 1126. Defendant contends that there is no basis in the terms of either the 1996 Agreement or the 2001 Agreement for any inference that money damages are payable for breach, let alone "a fair inference." [8] *See* Def.'s Mot. 9. The court agrees. Plaintiff has not demonstrated that there is a basis for a "fair inference" that he is entitled to money damages based on the government's breach of the 1996 Agreement or the 2001 Agreement.

In addition, as to the 2001 Agreement, the premise of plaintiff's argument—that he is entitled to the "default" remedy of money damages because he was without another remedy—is not properly invoked in this case. The District Court for the Northern District of California stated in the 2001 Agreement that it would retain jurisdiction over any disputes arising from the agreement. Am. Compl. Ex. B, ¶ 17 ("The parties agree that the [d]istrict [c]ourt shall retain jurisdiction over this matter for the purposes of resolving any dispute alleging a breach of this agree-

ment."). The Magistrate Judge who presided over the matter restricted the district court's jurisdiction to a one-year period beginning on April 26, 2001, the date that the 2001 Agreement was signed. *Id.* 5–6, 19–23. Plaintiff was afforded a remedy in the district court. He simply did not pursue it. He cannot argue here that he is entitled to a "default" remedy.

4. Statute of Limitations

■ Defendant also argues that plaintiff's claims are barred by the statute of limitations and therefore fall outside this court's jurisdiction. Def.'s Mot. 4–6. All claims that otherwise fall within the jurisdiction of the Court of Federal Claims "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2006). In *John R. Sand & Gravel Co. v. United States (John R. Sand)*, the Supreme Court recognized that statutes of limitations have been used to limit "the scope of a governmental waiver of sovereign immunity." *John R. Sand*, 552 U.S. 130, 133, 128 S.Ct. 750 (2008). In *John R. Sand*, the court defined the statute of limitations of the Court of Federal Claims as a "more absolute [ ] kind of limitations period" and as "jurisdictional" in nature. *Id.* at 133–34, 128 S.Ct. 750. Accordingly, pursuant to the statute, " '[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.' " *Brown v. United States*, 84 Fed. Cl. 400, 404 (2008) (quoting 28 U.S.C. § 2501). "A claim accrues when all the events have occurred which fix the liability of the government and entitle the claimant to institute an action." *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed.Cir.2006) (internal quotation marks omitted) (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988)); *see also Bowen v. United States*, 292 F.3d 1383, 1385 (Fed.Cir.2002) (stating that "a claim against the United States first accrues on the date when all the events have oc-

---

**8.** The court does not decide that the government's breach of a settlement agreement could never result in an award of money damages. The court decides only that plaintiff in this case has

failed to demonstrate how the contracts on which he relies support a "fair inference" that he is entitled to money damages.

curred which fix the liability of the [g]overnment and entitle the claimant to institute an action" (internal quotation marks and brackets omitted)).

In order to determine whether plaintiff's claims are time-barred, the court must determine when his claims first accrued.[9] According to the accrual suspension rule, as set out in *Young v. United States,* " 'the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed.' " 529 F.3d 1380, 1384 (Fed.Cir.2008) (quoting *Martinez v. United States,* 333 F.3d 1295, 1319 (Fed.Cir.2003)).[10] In order for a plaintiff to meet the standard for accrual suspension "the plaintiff 'must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was "inherently unknowable" at the accrual date.' " *Young,* 529 F.3d at 1384 (quoting *Martinez,* 333 F.3d at 1319).

Plaintiff argues that he "did not know and should not have known that the Navy breached its obligations under the 1996 and 2001 Agreements prior to August 2003 [six years prior to August 2009][11]—the threshold date for purposes of the statute of limitations." Pl.'s Resp. 3–4. Plaintiff asserts that "[w]ith respect to actual knowledge, [he] did not know that the Navy failed to expunge or correct his personnel record

until the Navy actually produced the contents of his record between 2006 and 2008." *Id.* at 4. Plaintiff states that he "should not have known that the breaches occurred, nor should he have had reason to inquire [with the Navy about the possibility of breach]." *Id.* However, this statement appears directly to contradict plaintiff's previous statement in his Amended Complaint that he was consistently denied employment in positions for which he was qualified between 2001 and 2006. Am. Compl. ¶ 40. The Amended Complaint also states that as early as 1999, plaintiff was "largely ... unsuccessful [in obtaining employment]" because his OPF was not changed in compliance with the 1996 Agreement nor were potential employers given "neutral" references. *Id.* ¶ 70.

There is no evidence that the Navy attempted to conceal plaintiff's record in this case. Despite plaintiff's belief that he was denied positions "[b]etween 2001 and the present" because his record was not changed in compliance with the 1996 Agreement and 2001 Agreement, plaintiff did not request a copy of his OPF or his records from the National Personnel Records Center (NPRC) until 2006. *See id.* ¶¶ 40–41. Plaintiff states that in 2006, and possibly before, he made "telephone calls" regarding his OPF to the NPRC and was told that his OPF was "checked-out" by the Military Sealift Command. *Id.* ¶ 67. Plaintiff does not state that he was denied access to his OPF—only that

**9.** The Supreme Court in *John R. Sand & Gravel Co. v. United States (John R. Sand),* stated that the statute of limitations, 28 U.S.C. § 2501 (2006), is applicable to Tucker Act cases but precluded equitable tolling under 28 U.S.C. § 2501. *John R. Sand,* 552 U.S. 130, 132–139, 128 S.Ct. 750 (2008). However, the accrual suspension rule, which is distinct from tolling, remains available under 28 U.S.C. § 2501. *See Young v. United States,* 529 F.3d 1380, 1384 (Fed.Cir.2008). The term "tolling" is sometimes used to describe the accrual suspension rule. *Id.* (citing *Martinez v. United States,* 333 F.3d 1295, 1319 (Fed.Cir.2003)).

**10.** The court also notes the non-binding but persuasive authority of *Roberts v. United States* in support of the "knew or should have known" standard discussed in *Young,* 529 F.3d at 1384. *Roberts v. United States,* 312 Fed.Appx. 340, 341–42 (Fed.Cir.2009) (unpublished decision) (agreeing with the trial court's finding that the accrual

suspension doctrine set forth in *Martinez* was inapplicable to plaintiff's claim for disability back pay based on the fact that plaintiff's military medical records were not concealed or inherently unknowable but " 'could have been discovered long ago' " (quoting *Roberts v. United States,* No. 07–763C, 2008 WL 4443107, at *4 (Fed.Cl. Sept.26, 2008))).

**11.** Plaintiff offers August 2003 as the "threshold date" for statute of limitations purposes. Plaintiff's Response to Defendant's Motion to Dismiss the First Amended Complaint (Pl.'s Resp.) 4. This date is six years prior to plaintiff's filing of his Amended Complaint and thus the latest qualifying date for plaintiff to "know" of the Navy's breach under the theory of accrual suspension. *See id.* at 3–4. In addition, this court uses the filing date of the Original Complaint, April 9, 2009, and not the Amended Complaint, August 17, 2009, as plaintiff does, *see id.* at 4, for purposes of date calculation in this case.

he was notified that his OPF was being kept at the Military Sealift Command. *See id.* In 2006, plaintiff requested and received his records from the Navy, *id.* ¶ 41, a fact which contradicts his argument that the Navy was concealing plaintiff's OPF, *see Roberts v. United States,* 312 Fed.Appx. 340, 342 (Fed. Cir.2009) (unpublished table decision) (affirming trial court's finding that plaintiff's failure to access his military records before the statute of limitations expired could not be equated with the military's concealment of or failure to produce those records). Further, plaintiff has not provided the court with any evidence that supports a finding that the Navy's breach was "inherently unknowable." To the contrary, plaintiff states: "Between 2001 and the present, [he] applied for various positions [for] which he was otherwise qualified. On information and belief, [he] was denied or not considered for these positions because of the Navy's breaches of the 1996 and 2001 Agreements." Am. Compl. ¶¶ 40.

As early as 1999 as to the 1996 Agreement and no later than 2002 as to the 2001 Agreement, plaintiff was on inquiry notice that the 1996 Agreement and 2001 Agreement had been breached. *See id.* ¶¶ 40, 70. In *Braude v. United States,* the plaintiff argued that suspension of accrual of the statute of limitations was required for her wrongful termination claim because she did not obtain official documentation that she had been wrongfully dismissed until the statute of limitations had expired. *Braude,* 218 Ct.Cl. 270, 585 F.2d 1049, 1050–52 (1978). The *Braude* court found that the plaintiff's long-standing feeling "that she had not been told the entire story about her discharge" combined with other facts, including the comments of her former supervisor, warranted a conclusion that the plaintiff was on "inquiry" that she

had a potential claim more than six years before she filed her petition and thus could not claim that the basis for her claim was concealed by the government. *Id.* at 1053–54 ("[W]e conclude[,] that the evidence before us establishes, as a matter of law, that the statute of limitations began to run as plaintiff acquired information and evidence which should have, and in the eyes of the law did, place her upon inquiry ... that she had a potential claim."). In this case, plaintiff was on at least inquiry notice that the 1996 Agreement and 2001 Agreement were not being carried out in accordance with their terms, but did not request access to his OPF between April 21, 2001, when the 2001 Agreement was executed, and May 2006, to determine whether his OPF had been changed in accordance with either of the agreements. *See* Am. Compl. ¶ 40–41. Despite plaintiff's "belief" that he was denied employment opportunities for which he was qualified as a result of breach, he took no action to confirm his suspicions until May 2006, *id.,* and did not file a claim with this court until April 9, 2009.[12] *See* Compl. 1. As a result, the accrual suspension doctrine is inapplicable to plaintiff's claims based on breach of either the 1996 Agreement or the 2001 Agreement.

In this case, the 2001 Agreement also contains specific language regarding its enforcement. United States Magistrate Judge Bernard Zimmerman indicated above his signature line on the 2001 Agreement that "jurisdiction pursuant to ¶ 17 is retained for [one] year." Am. Compl. Ex. B, 5–6 at 19–23. The 2001 Agreement also provides that "[t]he parties agree that the [d]istrict [c]ourt shall retain jurisdiction over this matter for the purposes of resolving any

---

12. The court does not apply the 2007 filing date of plaintiff's complaint in United States District Court for the Western District of New York, *Holmes v. Dep't of Navy,* 583 F.Supp.2d 431 (W.D.N.Y.2008), to its determination of the statute of limitations because upon disposition of that case, there was no transfer order issued. *See* 28 U.S.C. § 1631 (2006) ("[T]he action or appeal [transferred under 28 U.S.C. § 1631] shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court which it is transferred."); *Tex.*

*Peanut Farmers v. United States,* 409 F.3d 1370, 1374–75 (Fed.Cir.2005) ("[A]bsent transfer, applicable statutes of limitations may bar [plaintiffs] from adjudicating otherwise legitimate claims."); *see also Brown v. United States,* 84 Fed.Cl. 400, 406 (2008) ("[B]ecause this case was not transferred pursuant to 28 U.S.C. § 1631, this court cannot substitute the date on which the [complaint] was filed in [district court] ... [but rather] may only look to the date on which the [c]omplaint was field in this court ... to determine whether the claim is barred by the six-year statute of limitations.").

dispute alleging a breach of this agreement." *Id.* ¶ 17.[13]

The terms of the 2001 Agreement indicate that the district court and the parties viewed the one-year time period ending April 26, 2002 as a reasonable time period within which plaintiff could determine whether or not the Navy was in compliance with the agreement and pursue a court remedy for an alleged breach. *See id.* Ex. B, ¶ 17, 5–6 at 19–23. The 2001 Agreement supports the view that plaintiff "should have known" of breach on or prior to April 26, 2002 if he wished to pursue a remedy. The statute of limitations would therefore bar an action brought more than six years after April 26, 2002, that is, April 26, 2008, nearly a year before the April 9, 2009 filing date of plaintiff's Original Complaint.

## III. Conclusion

Plaintiff's claims under the 1996 Agreement and the 2001 Agreement are not within the jurisdiction of this court under the Tucker Act because neither can be fairly interpreted as mandating compensation by the United States. Even if the 1996 Agreement and the 2001 Agreement, or either of them, may be interpreted as mandating money damages for breach, the 1996 Agreement and the 2001 Agreement are outside the jurisdiction of this court because the statutes of limitation on plaintiff's claims have expired.

For the foregoing reasons, defendant's Motion to Dismiss is GRANTED. The Clerk of Court shall DISMISS the Amended Complaint without prejudice. No costs.

IT IS SO ORDERED.

---

13. In his Amended Complaint plaintiff refers to a July 11, 2001 letter from the Navy to the Assistant United States Attorney handling the "civil action," presumably the action resulting in the 2001 settlement agreement (2001 Agreement), stating that the Navy took the necessary steps to expunge plaintiff's OPF and that the Navy had requested corrections be made by the Marine Index Bureau to his records. Am. Compl. ¶ 39. No copy of the letter is included with the Amended Complaint nor is it explained how or from whom plaintiff received this letter. *See id.* Plaintiff does not argue that the July 11, 2001 letter should result in some type of tolling of the statute of limitations. *See id.;* Pl.'s Resp. 3–6.