# United States Court of Appeals for the Federal Circuit

---

**TIMOTHY O. HOLMES,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-5119

---

Appeal from the United States Court of Federal Claims in Case No. 09-CV-208, Chief Judge Emily C. Hewitt.

---

Decided: September 12, 2011

---

JAMES Y. BOLAND, Venable LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was TERRY L. ELLING.

RICHARD P. SCHROEDER, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington DC, argued for defendant-appellee. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and HAROLD D. LESTER, JR., Assistant Director.

---

Before PROST, SCHALL, and MOORE, *Circuit Judges.*

SCHALL, *Circuit Judge.*

Timothy O. Holmes appeals the final decision of the United States Court of Federal Claims dismissing for lack of jurisdiction his amended complaint asserting two separate breach of contract claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). *Holmes v. United States*, 92 Fed. Cl. 311 (2010). In his suit, Mr. Holmes alleged that the Department of the Navy breached two settlement agreements relating to Title VII[1] employment discrimination actions that he had brought against the Navy. The court granted the government's motion to dismiss under Rule of the Court of Federal Claims ("RCFC") 12(b)(1) for lack of jurisdiction on the ground that neither agreement could fairly be interpreted as mandating the payment of money damages for breach by the government. 92 Fed. Cl. at 321. In the alternative, the court ruled that, even if either agreement could fairly be interpreted as mandating money damages for breach, Mr. Holmes's suit was jurisdictionally barred by the six-year statute of limitations set forth at 28 U.S.C. § 2501. *Id.* The basis for the court's alternative ruling was its determination that Mr. Holmes, who acknowledged that his suit was filed outside the limitations period, was not entitled to the benefit of the accrual suspension rule. *Id.* at 320.

For the reasons set forth below, we hold that the settlement agreements at issue can fairly be interpreted as mandating the payment of money damages for breach by the government. We also hold that, at least insofar as the allegations in the amended complaint are concerned, Mr. Holmes has demonstrated entitlement to the benefit of the accrual suspension rule. We therefore reverse the

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

decision of the Court of Federal Claims and remand the case to the court for further proceedings consistent with this opinion.

BACKGROUND

I

The pertinent facts are set forth in the amended complaint ("Am. Compl."). *See Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005) ("Like the trial court, this court tests the sufficiency of the complaint as a matter of law, accepting as true all nonconclusory allegations of fact, construed in the light most favorable to the plaintiff.").

Mr. Holmes is a disabled Navy veteran who was honorably discharged in December of 1990 after twelve years of military service. Am. Compl. ¶ 13. He was subsequently employed by the Navy as a yeoman storekeeper aboard the USNS Mars, a naval supply ship operated by the Military Sealift Command, Pacific Fleet. *Id.* ¶ 16. Mr. Holmes was terminated from his employment aboard the Mars on July 22, 1994, purportedly for performance reasons. *Id.* ¶ 20. On October 1, 1994, he filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") alleging that he had been wrongfully terminated due to "false, malicious, and discriminatory accusations about his character and conduct aboard [the] USNS Mars." *Id.* ¶ 21. In August of 1995, Mr. Holmes and the Navy executed an agreement ("1995 Agreement") to settle the EEOC action. *Id.* ¶ 23. Under the terms of the 1995 Agreement, the Navy agreed (1) to remove from Mr. Holmes's Official Personnel Folder ("OPF") all adverse performance evaluations pertaining to his employment with the Navy for the period of time he was aboard the Mars; (2) to remove all records of disciplinary action taken against him during his employment;

and (3) to document his OPF to show that he had resigned for personal reasons on July 22, 1994. *Id.* ¶ 23.

In 1996, after requesting and receiving a copy of his personnel record, Mr. Holmes discovered that the Navy had not complied with its obligation under the 1995 Agreement to expunge adverse information from his OPF. *Id.* ¶ 24. He thereupon filed a second EEOC complaint alleging breach of the 1995 Agreement. *Id.* ¶ 25. In November of 1996, Mr. Holmes and the Navy signed an agreement ("1996 Agreement") to settle the second EEOC action. *Id.* ¶ 26, Ex. A. Under the 1996 Agreement, the Navy agreed (1) to employ Mr. Holmes as a yeoman storekeeper; (2) to provide him transportation to his worksite; and (3) to document his OPF to show that he had resigned on July 22, 1994 for personal reasons. *Id.* ¶ 27, Ex. A ¶ 2.

In accordance with the 1996 Agreement, the Navy employed Mr. Holmes as a yeoman storekeeper aboard the USNS Guadalupe, beginning in January of 1997. Am. Compl. ¶ 28. After leaving the Guadalupe in July of 1997, Mr. Holmes served aboard the USNS Kilauea as a civilian storekeeper from September of 1997 to August of 1998. *Id.* ¶¶ 29, 30. Following his departure from the Guadalupe, Mr. Holmes was accused of stealing a government-owned refrigerator from his stateroom and selling it to another crew member. *Id.* ¶ 29. This accusation led the Navy to suspend Mr. Holmes from his job aboard the Kilauea for fourteen days. *Id.* ¶ 31. In response, Mr. Holmes filed a third EEOC complaint. In it, he asserted that the allegation of theft and the resulting suspension were the result of "discriminatory and retaliatory conduct against him during his service aboard the USNS Guadalupe." *Id.* ¶ 32.

From October of 1998 to April of 1999, while his third EEOC complaint was pending, Mr. Holmes served as a civilian storekeeper aboard the USNS Niagara Falls. *Id.* ¶ 34. While aboard the Niagara Falls, he was accused of threatening a fellow crew member. As a result, the ship's captain proposed to remove Mr. Holmes from his position. *Id.* ¶ 35. After being notified of his proposed removal, Mr. Holmes resigned from his position aboard the Niagara Falls. *Id.* ¶ 36. According to Mr. Holmes, shortly after he resigned, he joined the Seafarers International Union ("SIU") and obtained several temporary contract jobs aboard civilian supply vessels as a storekeeper. *Id.* ¶ 71.

On December 16, 1999, Mr. Holmes withdrew his third EEOC complaint. Thereafter, on February 22, 2000, he filed a civil action against the Navy in the United States District Court for the Central District of California. The suit related to, inter alia, his fourteen-day suspension while aboard the Kilauea. *Id.* ¶ 37, Compl. for Employment Discrimination on the Basis of Reprisal at 3, *Holmes v. Danzig*, No. 00-01839 (C.D. Cal. Feb. 22, 2000). The case was subsequently transferred to the United States District Court for the Northern District of California. Am. Compl. ¶ 37.

Mr. Holmes and the Navy signed an agreement settling the district court action on April 26, 2001 ("2001 Agreement"). *Id.* ¶ 38, Ex. B. Under the terms of the 2001 Agreement, the Navy agreed to pay Mr. Holmes $1,000 and to "take the necessary steps, within a reasonable time, to expunge from [Mr. Holmes's] Official Personnel File, the fourteen-day suspension" and "to provide the Marine Index Bureau (MIB) with a neutral reference for [Mr. Holmes]."[2] *Id.*, Ex. B ¶¶ 2-4. Pursuant to para-

---

[2]    The MIB compiles data pertaining to claims by employees in the maritime industry in an effort to detect

graph 17 of the agreement and a handwritten note by the Magistrate Judge at the bottom of the agreement, the district court retained jurisdiction for one year "for the purposes of resolving any dispute alleging a breach of [the 2001 A]greement." *Id.*, Ex. B ¶ 17, p.5 ll.20-21; *see Holmes*, 92 Fed. Cl. at 314, 320-21. On July 11, 2001, the Navy stated in a letter to the Assistant United States Attorney handling the civil action that the Navy had taken the steps necessary to expunge Mr. Holmes's OPF and that it had asked the MIB to correct its records relating to Mr. Holmes. Am. Compl. ¶ 39.

Mr. Holmes requested and received copies of his personnel records from the Navy in May of 2006; the records indicated that the Navy had not documented his record to show that he resigned from the Navy for personal reasons effective July 22, 1994. *Id.* ¶¶ 41-42. Thereafter, in 2008, Mr. Holmes filed suit in the United States District Court for the Western District of New York, seeking compensatory damages for the Navy's breach of the 1996 Agreement. *Id.* ¶ 53. On October 31, 2008, the district court dismissed the complaint for lack of jurisdiction, stating that Mr. Holmes's breach of contract claim was required to be filed in the United States Court of Federal Claims. *Id.* ¶ 56; *Holmes v. Dep't of Navy*, 583 F. Supp. 2d 431, 433-34 (W.D.N.Y. 2008).

## II

Mr. Holmes filed suit in the Court of Federal Claims on April 9, 2009. In his amended complaint, filed on August 17, 2009, he alleged that the Navy had breached the 1996 Agreement by failing to document his OPF to reflect that he resigned from the Navy in 1994 for personal reasons. He also alleged that the Navy had

fraudulent claims. *See Barclay v. Keystone Shipping Co.*, 128 F. Supp. 2d 237, 241 n.7 (E.D. Pa. 2001).

breached the agreement by failing to expunge references to the circumstances of his discharge in 1994. He alleged that the Navy had breached the 2001 Agreement by failing to expunge references to the fourteen-day suspension. Am. Compl. ¶¶ 58-59, 61-64. As a result of these breaches, Mr. Holmes alleged, he had been largely unsuccessful in obtaining employment, and had not been able to obtain any employment since 2005. *Id.* ¶¶ 69-74. For the alleged breaches, Mr. Holmes sought monetary damages. *Id.* ¶ 75. The government moved to dismiss the amended complaint for lack of jurisdiction pursuant to RCFC 12(b)(1) or, alternately, for failure to state a claim pursuant to RCFC 12(b)(6). The government's jurisdictional motion made two separate arguments: (1) that Mr. Holmes had not established a money-mandating source of law for his claim in order to invoke jurisdiction under the Tucker Act; and (2) that his breach of contract claims were barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501.

The Court of Federal Claims granted the government's motion to dismiss for lack of jurisdiction, agreeing with the government that the terms of the 1996 and 2001 Agreements did not support a "fair inference" that Mr. Holmes was entitled to money damages for breach of contract. *Holmes*, 92 Fed. Cl. at 318 (citing *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472-73 (2003)). As a separate basis for its dismissal of the amended complaint, the court held that Mr. Holmes's suit, which concededly was filed more than six years after the Navy's alleged breaches, was barred by the six-year statute of limitations set forth in § 2501. In that regard, the court ruled that Mr. Holmes was not entitled to the benefit of the accrual suspension rule. *Id.* at 320-21. Having dismissed the amended complaint for lack of jurisdiction, the court did not reach the government's

motion to dismiss for failure to state a claim upon which relief could be granted.

Mr. Holmes appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I

We review *de novo* the Court of Federal Claims's dismissal of a claim for lack of jurisdiction. *Adair v. United States*, 497 F.3d 1244, 1250 (Fed. Cir. 2007); *Frazer v. United States*, 288 F.3d 1347, 1351 (Fed. Cir. 2002). On appeal, Mr. Holmes challenges both (1) the Court of Federal Claims's dismissal of his amended complaint for lack of jurisdiction under the Tucker Act, and (2) its dismissal of his claims as barred by the six-year statute of limitations of 28 U.S.C. § 2501. We address the first issue in Part II and the second issue in Part III.

### II

### A

The Court of Federal Claims derives its jurisdiction from the Tucker Act, which, in relevant part, gives the court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). The Tucker Act does not create substantive rights. Rather, it is a jurisdictional provision "that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)." *United States v. Navajo Nation*, 129 S. Ct. 1547, 1551 (2009). The other source of law need not *explicitly* provide that the right or duty it creates is enforceable through a suit

for damages, but it triggers liability only if it "can fairly be interpreted as mandating compensation by the Federal Government." *Id.* at 1552 (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)). This "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity. *White Mountain Apache Tribe*, 537 U.S. at 472. Thus, it is enough that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. *Id.* at 473. While the premise to a Tucker Act claim will not be "lightly inferred," a fair inference will do. *Id.* (quoting *United States v. Mitchell*, 463 U.S. 206, 218 (1983)).

In granting the government's motion to dismiss, the Court of Federal Claims stated that Mr. Holmes had failed to identify "any terms of either the 1996 Agreement or the 2001 Agreement which are reasonably amenable to a reading that supports [his] claim that he is entitled to money damages for defendant's breach." *Holmes*, 92 Fed. Cl. at 316. The court also stated that Mr. Holmes had not "demonstrated that there is a basis for a 'fair inference' that he is entitled to money damages based on the government's breach." *Id.* at 318. The court concluded that neither agreement could "be fairly interpreted as mandating compensation." *Id.* at 321.

Mr. Holmes argues that the Court of Federal Claims's Tucker Act jurisdiction encompasses his claims that the Navy breached the 1996 and 2001 Agreements. He also argues that because the agreements are express contracts, the court erroneously imposed upon him the burden of demonstrating a "fair inference" that the terms of the agreements entitle him to money damages. He maintains that such a burden does not exist when a Tucker Act claim is "founded . . . upon any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), because

money is the presumptive remedy for breach of contract.
In the absence of contract terms specifically precluding
the recovery of money damages, Mr. Holmes urges, a non-
breaching party is entitled to such damages when the
government breaches a contract. In short, Mr. Holmes
argues that the money-mandating requirement of Tucker
Act jurisdiction was satisfied by the very nature of his
suit – an action for breach of two Title VII settlement
agreements – and that the Court of Federal Claims erred
when it required him to identify "separate" money-
mandating provisions in the agreements. As he did in the
Court of Federal Claims, Mr. Holmes argues in the alter-
native that, assuming he was required to show that the
agreements could fairly be interpreted as contemplating
money damages for breach, he carried that burden.

Like Mr. Holmes, the government takes the position
that the Tucker Act's grant of jurisdiction for breach of
contract claims can encompass such claims arising from
Title VII settlement agreements. Appellee's Br. 51 &
n.8.[3] It argues, however, that the 1996 and 2001 Agree-
ments do not "provide[ ] for damages as a result of a
breach" and that therefore, the Court of Federal Claims
lacks jurisdiction. Appellee's Br. 52 n.8. In making this

---

[3]    The government states:

      We recognize that the Court of Federal Claims
possesses jurisdiction over a claim where plaintiff can
establish a substantive right enforceable against the
United States for money damages. It is the Govern-
ment's position that this includes a Title VII settle-
ment agreement providing for damages as a result of
a breach. Thus, simply because a settlement agree-
ment pertains to a Title VII case does not automati-
cally mean that the Court of Federal Claims lacks
jurisdiction.

Appellee's Br. 51.

argument, the government points to *Navajo Nation, Rick's Mushroom Service, Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008), and *Khan v. United States*, 201 F.3d 1375 (Fed. Cir. 2000). *See Navajo Nation*, 129 S. Ct. at 1551-52 ("Neither the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or *contracts*). . . . The other source of law need not *explicitly* provide that the right or duty it creates is enforceable through a suit for damages, but it triggers liability only if it can fairly be interpreted as mandating compensation by the Federal Government." (citations and internal quotations omitted) (first emphasis added)); *Rick's Mushroom*, 521 F.3d at 1343-44 ("Rick's does not point to a money-mandating provision that establishes jurisdiction for an implied-in-fact contract under 28 U.S.C. § 1491(a)(1) . . . ."); *Khan*, 201 F.3d at 1377-78 ("[T]o invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship, constitutional provision, statute, or regulation that provides a substantive right to money damages." (citing *Hamlet v. United States*, 63 F.3d 1097, 1101 (Fed. Cir. 1995))).

The government contends that the Court of Federal Claims properly examined whether the 1996 and 2001 Agreements were money-mandating, and that it correctly determined that Mr. Holmes had not carried his burden of establishing that the agreements supported a "fair inference" that money damages were payable in event of breach. Appellee's Br. 38-42, 48-50. The government points to the trial court's observation of "the absence of any provision mandating the payment of money for a breach by the government." *Holmes*, 92 Fed. Cl. at 317. In addition, it urges that both the 1996 Agreement and the 2001 Agreement provided for non-monetary remedies.

Specifically, according to the government, the EEOC regulation at 29 C.F.R. § 1614.504(a) provided Mr. Holmes with a way to obtain non-monetary relief, namely (1) compliance or (2) reinstatement of the original complaint. 29 C.F.R. § 1614.504(a). In the case of the 2001 Agreement, the government argues that the agreement is actually a consent decree because it was approved and "so ordered" by the district court in the Northern District of California. Am. Compl. Ex. B p.5 l. 20. The government makes the argument that, as a consent decree, the Court of Federal Claims lacked jurisdiction to enforce its terms.

B

Before addressing the money-mandating issue, however, we must resolve the initial jurisdictional question of whether the Court of Federal Claims may exercise its Tucker Act jurisdiction over a claim alleging breach of a Title VII settlement agreement. That is so even though Mr. Holmes and the government do not dispute the point. *See John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1353 (Fed. Cir. 2006) ("As an appellate court, we must be satisfied that the court whose opinion is the subject of our review properly exercised jurisdiction, regardless of whether the parties challenge the lower court's jurisdiction."), *aff'd*, 552 U.S. 130 (2008).

Our court has not addressed this question, and there is a split of authority on it in the Court of Federal Claims. Some decisions of the Court of Federal Claims have held that the court lacks Tucker Act jurisdiction over claims alleging breach of a Title VII settlement agreement due to the comprehensive statutory scheme established under Title VII, which assigns jurisdiction over discrimination suits to the district courts. *See, e.g., Griswold v. United States*, 61 Fed. Cl. 458, 464-65 (2004); *Taylor v. United States*, 54 Fed. Cl. 423, 425-26 (2002); *Mitchell v. United*

*States*, 44 Fed. Cl. 437, 438-39 (1999); *Lee v. United States*, 33 Fed. Cl. 374, 378-80 (1995); *Fausto v. United States*, 16 Cl. Ct. 750, 752-54 (1989).[4]  However, relying on *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375 (1994),[5] other Court of Federal Claims decisions have found such settlement agreements to fall outside the comprehensive scheme of Title VII and to be within the jurisdiction of the court.  *See Westover v. United States*, 71 Fed. Cl. 635, 638-39 (2006); *see also Taylor v. United States*, 73 Fed. Cl. 532, 541-45 (2006).

There also appears to be a split of authority among the regional circuits.  In *Frahm v. United States*, 492 F.3d 258 (4th Cir. 2007), the Court of Federal Claims had retransferred to the district court the plaintiff's claim alleging breach of a Title VII settlement agreement.  It did so because it concluded that Title VII's "comprehensive and exclusive statutory scheme" precluded its exercise of jurisdiction.  *Id.* at 261.  Subsequently, the district court agreed that it had jurisdiction because the plaintiff's claim arose under Title VII, but ultimately denied a motion by the plaintiff for monetary damages.  *Frahm v. United States*, No. 2-CV-00089, 2005 WL 1528421, at *2-3 (W.D. Va. June 23, 2005).  The Fourth Circuit affirmed.  *Frahm*, 492 F.3d at 262-63.  The D.C Circuit, however, has concluded that the Court of Federal Claims does have Tucker Act jurisdiction over these "straightforward con-

---

[4]     The Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902(a), 106 Stat. 4506, 4516, changed the name of the United States Claims Court to the United States Court of Federal Claims.  *Wilner v. United States*, 24 F.3d 1397, 1398 n.1 (Fed. Cir. 1994) (en banc).

[5]     In *Kokkonen* the Supreme Court distinguished actions based on a settlement agreement from an action under a law whose alleged violation gave rise to the settlement.  511 U.S. at 378-82.

tract dispute[s]." *See Greenhill v. Spellings*, 482 F.3d 569, 575 (D.C. Cir. 2007); *see also Hansson v. Norton*, 411 F.3d 231, 232, 237 (D.C. Cir. 2005) ("Because Hansson's claim for attorney's fees neither requires an interpretation of Title VII with respect to her discrimination complaint nor seeks equitable relief under Title VII, but rather seeks reasonable attorney's fees defined by well-established standards, it is a contract claim against the United States for more than $10,000 . . . [and] within the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act.")).

We agree with the D.C. Circuit, as well as Court of Federal Claims cases which have reached a similar conclusion, that Tucker Act jurisdiction may be exercised in a suit alleging breach of a Title VII settlement agreement. We do not view Title VII's comprehensive scheme as a bar to the exercise of such jurisdiction. In *Massie v. United States*, 166 F.3d 1184, 1188-89 (Fed. Cir. 1999), we held that a claim to enforce a contract resolving a dispute arising under the Military Claims Act fell within the Court of Federal Claims's jurisdiction, even though the agency decision out of which the dispute arose was not subject to judicial review. Likewise, in *Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358, 1367 (Fed. Cir. 1998), we stated that the broad jurisdictional grant set forth in 28 U.S.C. § 1491(a)(1) does not exempt contract claims that turn on the construction of statutes. We said: "It is often necessary to interpret or apply statutory or common law principles in order to resolve contract claims, but the fact that the resolution of a contract claim may turn on the interpretation of a statute does not deprive the Court of Federal Claims of jurisdiction over that claim." *Id.* In *Del-Rio Drilling Programs*, we concluded that the plaintiffs, who sought to recover damages from the government for alleged breach of its duties under

lease contracts, were entitled to sue in the Court of Federal Claims for enforcement of the contracts, even though the court might have to interpret the Tribal Consent Act or other state and federal law in order to resolve the contract claims. *Id.* at 1367-68. Similarly, although the 1996 and 2001 Agreements arose out of Title VII litigation, Mr. Holmes's suit for breach of contract is just that: a suit to enforce a contract with the government. *See generally Kokkonen*, 511 U.S. 375. In sum, we agree with the parties and hold that settlement agreements resolving Title VII disputes are not *per se* beyond the Tucker Act jurisdiction of the Court of Federal Claims.

## C

We turn now to the question of whether, in order to invoke the Tucker Act jurisdiction of the Court of Federal Claims, Mr. Holmes was required to show that the 1996 and 2001 Agreements could support a fair inference that he is entitled to the payment of money damages for breach, or was required to demonstrate that the two agreements could fairly be interpreted that way. As seen, the government contends that Mr. Holmes was required to make such a showing and that he failed to do so. Mr. Holmes argues, however, that because each of the agreements was an express contract with the government, such a showing was not necessary. He maintains that, because money damages are the presumptive remedy for breach of contract, the money-mandating requirement was met by the very nature of his suit – an action for breach of contract. In other words, he contends that he was not burdened with any fair inference or fair interpretation requirement.[6] Alternatively, he contends that, assuming

---

[6] The parties do not argue that the "fair inference" articulation of *White Mountain* alters or differs from the "fair interpretation" articulation, *see Fisher v. United*

he was required to demonstrate that the agreements could fairly be interpreted as contemplating money damages for breach, he did so.

As seen, the Tucker Act provides in relevant part that the Court of Federal Claims "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). In *Eastport Steamship Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967), the Court of Claims drew a distinction between claims arising under the Constitution, a statute, or a regulation and those stemming from a contract. In *Eastport*, the court stated that "[u]nder Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the [f]ederal [g]overnment for the damage sustained." 372 F.2d at 1009. The court exempted from the money-mandating requirement claims "which . . . fall under another head of jurisdiction, such as a contract with the United States." *Id.* at 1008 n.7. The Supreme Court subsequently adopted this distinction in *Testan*, stating that where a plaintiff does not "rest [its] claim[ ] upon a contract . . . [or] seek the return of money paid by [it] to the [g]overnment[, i]t follows that the asserted entitlement to money damages depends upon whether any federal statute 'can fairly be interpreted as mandating compensation by the [f]ederal [g]overnment for the damages sustained.'" 424 U.S. at 400 (quoting *Eastport*, 372 F.2d at 1009).

---

*States*, 402 F.3d 1167, 1173-74 (Fed. Cir. 2005) (non-en banc portion), and we view any distinction to be irrelevant in this case.

The Supreme Court has shown continued support for this distinction by excluding contract claims from its subsequent discussion of the money-mandating requirement. *See*, *e.g.*, *White Mountain Apache Tribe*, 537 U.S. at 472 ("It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages."); *Mitchell*, 463 U.S. at 218 ("[F]or claims against the United States 'founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department,' 28 U.S.C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained."). Generally, this court also has distinguished claims based upon the Constitution, a statute, or a regulation, from claims based upon a contract. *See, e.g.*, *Adair*, 497 F.3d at 1250 ("When the source of such alleged right is a statute, it can only support jurisdiction if it qualifies . . . as money-mandating." (citing *White Mountain Apache Tribe*, 537 U.S. at 473)); *Fisher*, 402 F.3d at 1173 (en banc) ("When a complaint is filed alleging a Tucker Act claim based upon a Constitutional provision, statute, or regulation, . . . the trial court at the outset shall determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating."); *Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004) (stating, in a case presenting three types of claims, that "claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver"); *Tippett v. United States*, 185 F.3d 1250, 1254-55 (Fed. Cir. 1999) ("When a contract is not involved, to invoke jurisdiction under the Tucker Act, a plaintiff must identify a constitutional provision, a statute, or a regulation that provides a substantive right to money damages.").

In our view, when referencing the money-mandating inquiry for Tucker Act jurisdiction, the cases logically put to one side contract-based claims. To begin with, "[n]ormally contracts do not contain provisions specifying the basis for the award of damages in case of breach . . . ." *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004). Moreover, we have stated:

> [I]n the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement. Indeed, as a plurality of the Supreme Court noted in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), "damages are always the default remedy for breach of contract." *Id.* at 885, 116 S.Ct. 2432 (plurality opinion) (citing, *e.g.*, *Restatement (Second) of Contracts* § 346, cmt. a (1981)).

*Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001). Thus, when a breach of contract claim is brought in the Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required. We view this presumption as forming the likely basis for the disparate discussion of claims arising under the Constitution, a statute, or a regulation and those stemming from a contract. Put another way, in a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary.

That is not to say, however, that the existence of a contract always means that Tucker Act jurisdiction exists. A contract expressly disavowing money damages would not give rise to Tucker Act jurisdiction, and we have found Tucker Act jurisdiction lacking in the case of an agreement "entirely concerned with the conduct of the parties in a criminal case." *Sanders*, 252 F.3d at 1334; *see also Kania v. United States*, 650 F.2d 264, 268-69 (Ct. Cl. 1981). In short, "[t]he government's consent to suit under the Tucker Act does not extend to every contract." *Rick's Mushroom*, 521 F.3d at 1343.

In *Rick's Mushroom*, the plaintiff brought suit in the Court of Federal Claims under the Contract Disputes Act, 41 U.S.C. §§ 601-613 ("CDA"), based upon a cost-share agreement with the Natural Resource Conservation Service ("NRCS"). The Court of Federal Claims held that because the contract between Rick's and the NRCS was a cooperative agreement and not a procurement contract, there was no basis for jurisdiction under the CDA for Rick's breach of contract claim.[7] *Rick's Mushroom Serv., Inc. v. United States*, 76 Fed. Cl. 250, 258 (2007). It therefore dismissed the complaint and Rick's appealed. We affirmed the dismissal. *Rick's Mushroom*, 521 F.3d at 1348. We agreed with the Court of Federal Claims that Rick's cost-share agreement with the NRCS was not a procurement contract and that therefore the CDA was inapplicable to the agreement and could not provide a basis for jurisdiction under § 1491(a)(2). *Id.* at 1344. In reaching that conclusion, we noted that Rick's breach of contract claim fell outside of the Tucker Act's jurisdiction because the unique cost-share agreement at issue "d[id] not provide a substantive right to recover money-damages

---

[7] The Court of Federal Claims has jurisdiction over CDA claims pursuant to 28 U.S.C. § 1491(a)(2).

and Rick's d[id] not point to a money-mandating source of law to establish jurisdiction under 28 U.S.C. § 1491(a)(1)," and "[i]nstead, Rick's attempt[ed] to rely on the CDA . . . to establish jurisdiction under 28 U.S.C. § 1491(a)(2). *Id.* at 1343.

We also rejected Rick's attempt to establish jurisdiction based upon an implied-in-fact contract with the NRCS. *Id.* at 1344. As an adjunct to its CDA claim, Rick's had alleged breach of an implied warranty under *United States v. Spearin*, 248 U.S. 132 (1918), which sets forth the rule that a contractor bound to build according to government plans and specifications is not responsible for the consequences of defects in those plans and specifications. 76 Fed. Cl. at 259. In holding that it lacked jurisdiction over the alleged implied contract, the Court of Federal Claims determined that even if the CDA included the type of agreement at issue, Rick's had not pleaded the requirements of a valid contract. *Id.* at 260-61. Agreeing, we stated that Rick's had not pointed to a money-mandating provision that established jurisdiction for an implied-in-fact contract under § 1491(a)(1) and that Rick's could not establish jurisdiction under § 1491(a)(2) because it had not alleged an implied-in-fact contract for procurement of goods or services which would come within the CDA. *Rick's Mushroom*, 521 F.3d at 1344. In addition, we found jurisdiction lacking for the further reason that "this court may only find an implied-in-fact contract when there is no express contract." *Id.* at 1344 (citing *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)).

We do not agree with Mr. Holmes that the Court of Federal Claims erred in requiring him to demonstrate that the 1996 and 2001 Agreements could fairly be interpreted as contemplating money damages for breach. Both agreements settled Title VII discrimination complaints,

and we readily accept that settlement of a Title VII action involving the government could involve purely non-monetary relief – for example, a transfer from one agency office to another.[8] Under these circumstances, in this case, we think it was proper for the court to require a demonstration that the agreements could fairly be interpreted as contemplating money damages in the event of breach. That said, we do agree with Mr. Holmes's alternative argument: that the agreements can fairly be interpreted as contemplating such damages. The Court of Federal Claims therefore has jurisdiction over Mr. Holmes's breach of contract claims.

As noted, under the 1996 Agreement, the Navy agreed to document Mr. Holmes's OPF to show that he had resigned on July 22, 1994 for personal reasons. Am. Compl. ¶ 27, Ex. A ¶ 2. Likewise, under the 2001 Agreement, the Navy agreed to "take the necessary steps, within a reasonable time, to expunge from [Mr. Holmes's] Official Personnel File, the fourteen-day suspension" and "to provide the Marine Index Bureau . . . with a neutral reference for [Mr. Holmes]." Am. Compl. ¶ 38, Ex. B ¶¶ 3-4. We think that, in the context of the two agreements, the purpose of documenting and expunging Mr. Holmes's record clearly was to prevent Mr. Holmes from being denied future employment based on his record as the Navy maintained it prior to the agreements. In short, the agreements inherently relate to monetary compensation through relationship to Mr. Holmes's future employment.

---

[8] Indeed, we note that money damages appear not to be the routine remedy for the breach of a settlement agreement involving an employment dispute. Typically, the employee's remedy is enforcement of the settlement terms or rescission of the settlement agreement and reinstatement of the underlying action. *See, e.g., Harris v. Brownlee*, 477 F.3d 1043, 1047 (8th Cir. 2007).

Further, there is no language in the agreements indicating that the parties did not intend for money damages to be available in the event of breach.

Neither do we think that the EEOC regulation to which the government points bars the exercise of Tucker Act jurisdiction. Section 1614.504(a) provides that a complainant alleging breach of an EEOC agreement "shall notify the [Equal Employment Opportunity] Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance [and] may request that the terms of settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing . . . ." 29 C.F.R. § 1614.504(a). Without diminishing the force of this regulation, we see no reason for § 1614.504(a) to preclude a suit for money damages in the event of breach that is separate from, or in addition to, the relief the regulation provides.[9]

Finally, we need not reach the issue of whether the Court of Federal Claims has jurisdiction over consent decrees because we do not agree with the government that the 2001 Agreement is a consent decree. As the First Circuit has explained, the Supreme Court has emphasized three related factors to be used to determine if a court-ordered consent decree exists: (1) the change in legal relationship must be court-ordered, (2) there must be judicial approval of the relief vis-à-vis the merits of the

---

[9] We acknowledge that at least one other circuit has reached the contrary conclusion. *See Frahm*, 492 F.3d at 262-63 (affirming the district court's denial of a motion for monetary damages and stating that neither the settlement agreement nor a statute allowed a suit for damages and that § 1614.504(a) provided the exclusive remedy for alleged breach of a Title VII settlement agreement).

case, and (3) there must be "judicial oversight and ability to enforce the obligations imposed on the parties." *Aronov v. Napolitano*, 562 F.3d 84, 90 (1st Cir. 2009) (en banc) (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 & n.7 (2001)). As far as the 2001 Agreement is concerned, the Magistrate Judge retained jurisdiction for one year; yet it is clear that the parties' obligations were meant to continue past one year. The 2001 Agreement provides that "Plaintiff hereby agrees *never* again to apply for employment with Defendant or any agency, activity, or office under the command of Defendant, including but not limited to Military Sealift Command . . . ." Am. Compl. Ex. B ¶ 5. (emphasis added). Thus, the district court did not maintain "judicial oversight and ability to enforce the obligations imposed on the parties" because its jurisdiction lasted only for a year, while obligations under the agreement extended well beyond that period. For at least this reason, the 2001 Agreement is not a consent decree.

## III

### A

As noted, the Court of Federal Claims separately ruled that it lacked jurisdiction because, as Mr. Holmes acknowledged, his complaint was filed more than six years after the Navy allegedly breached the two agreements, and because the court determined that he was not entitled to the benefit of the accrual suspension rule.

Section 2501 states that all claims that otherwise fall within the jurisdiction of the Court of Federal Claims "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A cause of action first accrues when all the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action. *Ingrum v.*

*United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009). Generally, "[i]n the case of a breach of a contract, a cause of action accrues when the breach occurs." *Alder Terrace, Inc., v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (quoting *Mfrs. Aircraft Ass'n v. United States*, 77 Ct. Cl. 481, 523 (1933)). Compliance with the statute of limitations is a jurisdictional requirement. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133-34 (2008).

In the Court of Federal Claims, Mr. Holmes took the position that the government breached the 1996 Agreement by failing to act in or around November 1996 and that it breached the 2001 Agreement by failing to act in or around April 2001.[10] *See* Am. Compl. ¶¶ 58, 61. That meant that, in the case of each agreement, Mr. Holmes's suit, which was first filed on April 9, 2009, was filed outside the six-year limitations period, as it was filed over twelve years after the alleged breach of the 1996 Agreement and approximately eight years after the alleged breach of the 2001 Agreement, or, as the Court of Federal Claims noted, approximately seven years after the conclusion of the one-year period during which the district court retained jurisdiction over the 2001 Agreement. *Holmes*, 92 Fed. Cl. at 321.

However, as the Court of Federal Claims noted, the "accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." *Id.* at 319 (quoting *Young v. United States*, 529 F.3d 1380,

---

[10] The 1996 Agreement did not set forth a time frame within which the Navy was required to document Mr. Holmes's OPF to indicate that he had resigned for personal reasons. The 2001 Agreement required the Navy to expunge Mr. Holmes's OPF "within a reasonable time." Am. Compl. Ex. B ¶ 3.

1384 (Fed. Cir. 2008)).[11]  For the accrual suspension rule to apply, the plaintiff "must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." *Young*, 529 F.3d at 1384 (quoting *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc)).[12] In the Court of Federal Claims, Mr. Holmes acknowledged that, in the case of both the 1996 and the 2001 Agreements, his original complaint was filed more than six years after the government's breach.  He argued, though, that he was entitled to the benefit of the accrual suspension rule.  Pl.'s Resp. to Def.'s Mot. to Dismiss First Am. Compl. ("Pl.'s Resp.") at 3-6, *Holmes v. United States*, No. 09-208C (Fed. Cl. Dec. 2, 2009).

The Court of Federal Claims found that there was no evidence that the Navy had attempted to conceal Mr. Holmes's records or that would support a finding that the Navy's breach of the agreements was "inherently unknowable."  *Holmes*, 92 Fed. Cl. at 319-20.  The court determined that Mr. Holmes was on inquiry notice that the 1996 Agreement had been breached as early as 1999, in view of statements in the amended complaint suggest-

---

[11]    As the Court of Federal Claims observed, the accrual suspension rule is distinct from equitable tolling, which the Supreme Court has stated is precluded under 28 U.S.C. § 2501.  *Holmes*, 92 Fed. Cl. at 319 n.9 (citing *John R. Sand & Gravel*, 552 U.S. at 132-39).

[12]    Although it is sometimes stated that accrual of a claim against the United States will be suspended until the claimant "knew or should have known" that the claim existed, we have explained that this formulation does not represent a separate test and has been used interchangeably with the "concealed or inherently unknowable" standard.  *Ingrum*, 560 F.3d at 1315 n.1.  We have endorsed the latter standard as preferable, however, because it is "both more common and more precise."  *Id.*

ing that he was unsuccessful in obtaining employment as early as 1999 and that he believed this was due to the Navy's breach. *Id.* at 320 (citing Am. Compl. ¶ 70 and *Braude v. United States*, 585 F.2d 1049, 1050-52 (Ct. Cl. 1978)). As far as the 2001 Agreement was concerned, the court found that Mr. Holmes was on "inquiry notice" that the 2001 Agreement had been breached no later than April 26, 2002, which marked the end of the one-year period during which the district court retained jurisdiction over the agreement. *Id.* at 321. As further support for its finding that Mr. Holmes was on "inquiry notice" by no later than 2002, the court pointed to Mr. Holmes's statement in the amended complaint that "[b]etween 2001 and the present, [he] applied for various positions [for] which he was otherwise qualified" yet "[o]n information and belief, [he] was denied or not considered for those positions because of the Navy's breaches of the 1996 and 2001 Agreements." *Id.* at 320 (quoting Am. Comp. ¶ 40). Having rejected Mr. Holmes's reliance on the accrual suspension rule, the Court of Federal Claims held that Mr. Holmes's breach of contract claims were time-barred. *Id.* at 321.

B

Mr. Holmes does not contend on appeal that the Navy attempted to conceal its alleged breach of the two agreements. Instead, he argues that the breach was "inherently unknowable." He relies on *L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359 (Fed. Cir. 1982), as interpreting the "inherently unknowable" doctrine to "stand[ ] for no more than that the 'statute will not begin to run until [the claimant] learns or reasonably should have learned of his cause of action.'" *Id.* at 1366 (citing *Japanese War Notes Claimants Ass'n v. United States,* 373 F.2d 356, 359 (Ct. Cl. 1967)). In *L.S.S. Leasing*, we held that a lessor's claim against the United States for payment for

the government's overtime use of a leased facility was not partially time-barred by a prior version of 28 U.S.C. § 2501.  695 F.2d at 1366.  We concluded that the lessor could recover for overtime use beyond the six-year time frame because we saw "no basis for holding that it would have been reasonable for the lessor to have discovered [that] use at an earlier date," because the government had taken control of after-hours access to the leased facility and was tasked with reporting its overtime use to the lessor.  *Id.*  Mr. Holmes contends that this court's decision in *L.S.S. Leasing* indicates that "application of the statute of limitations periods [sic] is dependent upon the facts of each case, and must be subjected to a test of 'reasonableness.'"  Reply Br. 17-20.

Mr. Holmes argues, as he did before the Court of Federal Claims, that he did not actually know that the Navy had breached its obligations under the agreements until he received copies of his OPF from the Navy in 2006.  Appellant's Br. 46; Pl.'s Resp. at 4.  He contends that, in any event, the earliest time at which he reasonably should have known of the breaches was in 2005, when the SIU and civilian supply vessel employers began conducting background checks and he was no longer offered contract jobs.  *See* Appellant's Br. 46-49, 51-52; Am. Compl. ¶ 72.  According to Mr. Holmes, the Court of Federal Claims misconstrued the allegations in the amended complaint to mean that he believed the Navy had breached the agreements at the time he was turned down for jobs, i.e., starting in 1999 due to the Navy's breach of the 1996 Agreement, and in 2001 due to the Navy's breach of the 2001 Agreement.  Instead, Mr. Holmes argues, paragraphs 40 and 70 in the amended complaint were merely assertions that he "only now believes that the Navy's breaches caused him damages as early as 1999" and he "did not state or otherwise imply in

the complaint that he believed or suspected *at the time* that the Navy's breaches were causing him harm." Appellant's Br. 46. Contrary to the court's findings, Mr. Holmes argues that these paragraphs do not indicate that he was on "inquiry notice" prior to 2005 that the 1996 and 2001 Agreements had been breached.[13]

Mr. Holmes also argues that the fact that he was having some difficulty obtaining employment was not alone enough to put him on inquiry notice of the breaches because applicants for jobs are not offered positions for a multitude of reasons. This is particularly so, he urges, because he was able to secure temporary employment after he resigned from the Navy in 1999, before the SIU began its background checks in 2005. Mr. Holmes contends that the Court of Federal Claims ignored allega-

---

[13]   The paragraphs of the Amended Complaint to which the Court of Federal Claims pointed read as follows:

> 40. Between 2001 and the present, Mr. Holmes applied for various positions which he was otherwise qualified [sic]. On information and belief, Mr. Holmes was denied or not considered for these positions because of the Navy's breaches of the 1996 and 2001 Agreements.
> . . .
> 70. Mr. Holmes has attempted to obtain employment multiple times since 1999, but has largely been unsuccessful because his personnel record retained by the Navy contained unfavorable employment information that discouraged potential employers from hiring him. Moreover, on information and belief, representatives of the Military Sealift Command have given negative and other than "neutral" references to prospective employers.

Am. Compl. ¶¶ 40, 70.

tions in the amended complaint relating to his periods of temporary employment, as well as allegations that the Navy *had* complied with some of its obligations under the Agreements, by paying him $1,000 (2001 Agreement) and by employing him (1996 Agreement). In addition, he points to the July 11, 2001 letter alleged in paragraph 39 of the amended complaint. In that letter, Mr. Holmes asserts, the Navy told the Assistant United States Attorney representing the government in the Northern District of California litigation that it had expunged his OPF and asked the MIB to correct its records relating to him. Am. Compl. ¶ 39; *see* Oral Arg. at 13:38-14:27 & 41:39-42:15, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2010-5119/all. Mr. Holmes maintains that he was not obligated to continuously monitor whether the Navy had complied with its duties under the agreements, since government officials are presumed to act in good faith. *See Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1288 (Fed. Cir. 2010) ("As an initial matter, government officials are presumed to act in good faith.").

The government responds that the Court of Federal Claims correctly held that Mr. Holmes failed to show that his alleged injury was "inherently unknowable" when his claims accrued. The government argues that the circumstances of this case are analogous to those in our unpublished decision in *Roberts v. United States*, 312 F. App'x 340, 341-42 (Fed. Cir. 2009). In *Roberts*, a former service member discovered an injury upon receipt of his military service records almost 40 years after his discharge from the Army. We held that the former service member could not receive the benefit of the accrual suspension rule because he "failed to demonstrate, or even suggest," that the pertinent records were unavailable from the time of his discharge until 2004, and that his injury thus was

"inherently unknowable." *Id.* at 342. Because Mr. Holmes does not allege that he was denied access to his OPF and because Mr. Holmes had difficulty obtaining employment as early as 1999, the government argues, he has not established that his injury was "inherently unknowable." *See also Ingrum*, 560 F.3d at 1315 & n.1, 1317 (concluding that the plaintiff's claims were not inherently unknowable because the government's actions on the plaintiff's property were open and notorious, even though the plaintiff's property was located several hundred miles from his residence, poor road conditions kept him from visiting the property using a southern route, and accessing his property from a northern route required seven to nine additional hours of driving). The government argues that *L.S.S. Leasing* is distinguishable because the contract at issue in that case included a reporting obligation not present in either the 1996 or 2001 Agreements.

## C

We agree with Mr. Holmes that the "concealed or inherently unknowable" test, which has been used interchangeably with the "knew or should have known" test, *Ingrum*, 560 F.3d at 1315 n.1, includes an intrinsic reasonableness component. As the Court of Claims explained in *Japanese War Notes Claimants Association*,

> An example of [an inherently unknowable injury] would be when defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit. In this situation the statute will not begin to run until plaintiff *learns or reasonably should have learned* of his cause of action.

73 F.2d at 359 (citations omitted) (emphasis added). As noted, in *L.S.S. Leasing*, we stated that the "inherently unknowable" test includes a reasonableness component.

695 F.2d at 1366. In *L.S.S. Leasing*, the court permitted the plaintiff's recovery for the government's overtime use occurring prior to the six-year limitations period, even though it appeared that nothing prevented the plaintiff lessor from discovering the use earlier. We stated that, in view of the fact that the government had taken upon itself the obligation to report overtime usage, the lessor was "relieved" of "the costly burden of monitoring such usage." *Id.* Accordingly, we saw "no basis for holding that it would have been reasonable for the lessor to have discovered the use at an earlier date." *Id.* While we have stated that the "concealed or inherently unknowable" formulation of the test for accrual suspension is "more common and more precise" than the "knew or should have known" formulation, *Ingrum*, 560 F.3d at 1315 n.1, we do not view that statement as eschewing the reasonableness component of the "inherently unknowable" prong of the test. Nothing in *Ingrum*, or the case it cites on this point, *Martinez*, can be said to prohibit such a reasonableness inquiry. *See Ingrum*, 560 F.3d at 1315-16 (finding that the government's use of fill material from the plaintiff's property was not "inherently unknowable," where the use was open and notorious and where the plaintiff was on notice of the possibility that the government would use the fill material); *Martinez*, 333 F.3d at 1319 (finding that a former service member was barred from proceeding with his suit for unlawful discharge, where he was not unaware of the existence of his injury and the acts giving rise to his claim at the time of the unlawful discharge). Further, in its brief the government itself acknowledges that the "inherently unknowable" test includes a reasonableness component. *See* Appellee's Br. 17 ("Pursuant to the 'inherently unknowable' prong of the accrual suspension doctrine, in certain narrow circumstances, the statute of limitations 'will not begin to run until plaintiff learns or reasonably should have learned of his cause of

action.'" (quoting *Japanese War Notes Claimants Ass'n*, 373 F.2d at 359)).

D

The 2001 Agreement required the Navy to expunge the fourteen-day suspension from Mr. Holmes's OPF and to provide the MIB with a neutral reference for him. As set forth in the amended complaint, two and a half months after the 2001 Agreement was signed, "the Navy stated in a letter to the Assistant United States Attorney handling the civil action [which led to the 2001 Agreement] that the Navy took the necessary steps to expunge Mr. Holmes's Official Personnel Folder and that the Navy requested corrections to the Marine Index Bureau pertaining to Mr. Holmes." Am. Compl. ¶ 39.[14] Thus, according to Mr. Holmes, very shortly after the 2001 Agreement was signed, the Navy, whose officials are presumed to act in good faith, *see Savantage Financial Services*, 595 F.3d at 1288, affirmatively stated that steps necessary for the Navy to comply with its obligations under the agreement had been taken. In the context of this case, we view the Navy's statement as no less compelling than the overtime reports that the government was required to make to the lessor in *L.S.S. Leasing*. In addition, although Mr. Holmes alleged that, since 2001,

[14] As the Court of Federal Claims noted, Mr. Holmes did not attach a copy of this letter to his amended complaint, nor did he argue before the court that the letter should result in some type of tolling of the statute of limitations. *Holmes*, 92 Fed. Cl. at 321 n.13. However, construing all facts in the amended complaint in Mr. Holmes's favor, as we must, *see Samish Indian Nation*, 419 F.3d at 1364, we assume that this letter declared what Mr. Holmes alleges: that the Navy stated that it had taken the necessary steps to expunge his OPF and that it had requested that the MIB correct its records pertaining to him. Am. Compl. ¶ 39.

he had been denied positions for which he was qualified, he also alleged that, after leaving his position with the Navy in 1999, and before the SIU began conducting background checks in 2005, he was able to secure some maritime employment. *Am. Compl.* ¶¶ 40, 71, 72. Further, because Mr. Holmes received different information from the Navy and Military Sealift Command in response to different requests, *see id.* ¶¶ 41-42, 49-52, 54-55, it seems that he could have checked his OPF after the Navy's alleged breach and not received any information about the alleged breach, only to check again later and receive such information. In short, given the facts set forth in the amended complaint, including (i) the Navy's contractual promise, (ii) its affirmative statement in the July 2001 letter, and (iii) Mr. Holmes's ability to obtain employment, as well as the presumption that government officials act in good faith, we are not prepared to say that, as far as the "inherently unknowable" standard is concerned, Mr. Holmes acted unreasonably in not double-checking the Navy's contract performance earlier. We thus disagree with the Court of Federal Claims that Mr. Holmes was under a duty to inquire as to whether the Navy had breached the 2001 Agreement.

Mr. Holmes does not allege that the July 2001 letter addressed the Navy's performance under the 1996 Agreement, but the alleged breach of this earlier agreement was in the same stream of events as the alleged breach of the 2001 Agreement. Further, according to the amended complaint, the Navy partially complied with its obligations under the 1996 Agreement by appointing Mr. Holmes as a yeoman storekeeper aboard the USNS Guadalupe between January 1997 and July 1997. Am. Compl. ¶ 28. Moreover, as noted, after leaving the Navy in 1999 Mr. Holmes was able to obtain several temporary contract jobs. *Id.* ¶ 71.

It is true that, prior to the execution of the 1996 Agreement, Mr. Holmes had requested and received a copy of his personnel record and had discovered that the Navy had failed to comply with the 1995 Agreement to expunge his record. *Id.* ¶ 24. We do not believe, however, that either this fact, or Mr. Holmes's unsuccessful attempts to obtain employment after the 1996 Agreement, were sufficient to reasonably put him on inquiry notice of the Navy's alleged breach of the 1996 Agreement. That is because, viewing the facts in the light most favorable to Mr. Holmes, it is reasonable to conclude that the Navy's execution of the 1996 Agreement, along with its partial performance thereof, could have provided the basis for a belief on Mr. Holmes's part that the Navy had performed its obligations under the 1996 Agreement. In view of his ability to obtain employment, the Navy's contractual promise, and his knowledge that the Navy had partially performed, we do not believe Mr. Holmes was on "inquiry notice" that the Navy had breached the 1996 Agreement. Relatedly, we do not agree with the Court of Federal Claims's reading of paragraphs 40 and 70 of the amended complaint. We agree with Mr. Holmes that these paragraphs are most properly read as stating Mr. Holmes's state of mind when he filed the amended complaint in 2009, rather than during the period when he alleges the Navy breached the 1996 and 2001 Agreements.

Finally, we think the circumstances of this case serve to distinguish it from both *Roberts* and *Ingrum*, upon which the government relies. Neither of those cases involved agreements in which the government promised to take certain action (thereby bringing into play the proposition that government officials are presumed to act in good faith), combined with indications that the promised action had been taken. Rather, those cases involved the situation in which a plaintiff simply failed to request

information from the government when he could have done so (*Roberts*) and the situation in which the governmental conduct on the plaintiff's property was open and notorious but the plaintiff did not avail himself of the opportunity of discovering it (*Ingrum*).

We agree with Mr. Holmes that he reasonably should have known of the alleged breach of the 1996 and 2001 Agreements for purposes of the statute of limitations when the SIU began conducting background checks in 2005 and he was no longer being offered contract jobs. Therefore, having demonstrated entitlement to the benefit of the accrual suspension rule, and having filed his complaint within six years of when he reasonably should have known of the alleged breach, Mr. Holmes's suit is not time-barred and thus beyond the Court of Federal Claims's jurisdiction.[15]

CONCLUSION

For the foregoing reasons, we reverse the decision of the Court of Federal Claims dismissing Mr. Holmes's amended complaint for lack of jurisdiction. The case is remanded to the Court of Federal Claims for further proceedings consistent with this opinion.[16]

---

[15] Our holding is based solely on the allegations set forth in the amended complaint. After discovery, as Mr. Holmes has acknowledged, the government may be warranted in renewing its motion to dismiss for lack of jurisdiction due to the statute of limitations, should evidence suggest that, in fact, Mr. Holmes knew or reasonably should have known of the Navy's alleged breach at an earlier date. *See* Oral Arg. at 44:39-46:03, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2010-5119/all.

[16] Our holding that the Court of Federal Claims has jurisdiction does not address whether Mr. Holmes's suit is subject to dismissal on the merits under RCFC 12(b)(6)

## REVERSED and REMANDED

C<small>OSTS</small>

Each party shall bear its own costs.

---

for failure to state a claim upon which relief could be granted. *See e.g.*, *Adair*, 497 F.3d at 1251; *Fisher*, 402 F.3d at 1175-76 (non-en banc portion).